## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**THE MOODY BIBLE INSTITUTE OF CHICAGO**, an Illinois not for profit corporation,

Case No.:

Plaintiff,

**VERIFIED COMPLAINT**

v.

**BOARD OF EDUCATION OF THE CITY OF CHICAGO**, a body politic and corporate,

Defendant.

_____

## INTRODUCTION

1.      This civil-rights action challenges the Board of Education of the City of Chicago's unlawful exclusion of a religious college and its students from Chicago Public Schools' student-teaching program solely because the college exercises its constitutionally and legally protected right to hire employees who share its religious beliefs.

2.      The Moody Bible Institute of Chicago prepares future elementary school teachers and requires all its student teachers to comply fully with the rules and policies of the cooperating school or district in which they are placed.

3.      Yet the Board, which is the government body responsible for the supervision and management of Chicago Public Schools, has denied Moody and its students access to Chicago Public Schools' student-teaching program unless Moody agrees to surrender its legal rights to make its *own* employment decisions based on religious faith.

4.      As a condition of participation, Chicago Public Schools insists that Moody sign agreements with employment nondiscrimination provisions that forbid

Moody from employing only those who share and live out its faith (the "Employment Provisions").

5.     Such a requirement is unlawful. The Supreme Court has repeatedly held that the government cannot exclude religious observers from otherwise available public benefits based on their religious character or exercise. *See, e.g.*, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017); *Carson v. Makin*, 596 U.S. 767 (2022). Nor may the government interfere with a religious organization's decision about who may "personify" its beliefs or "minister to the faithful." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188, 195 (2012).

6.     By excluding Moody and its students for Moody's faith-based employment practices, the Board violates the First Amendment to the United States Constitution and the Illinois Religious Freedom Restoration Act.

7.     The exclusion is even more troubling because every year Chicago Public Schools struggles to fill hundreds of vacant teaching positions. By barring Moody and its students from participation, the Board not only violates their constitutional and statutory rights but also deprives its own schools and students of well-prepared and qualified student teachers.

8.     Moody seeks declaratory and injunctive relief on behalf of itself and its students to end these ongoing constitutional and statutory violations and grant it equal access to Chicago Public Schools' student-teaching program. Moody also seeks damages to remedy the past violations and injuries.

## JURISDICTION AND VENUE

9.     This case raises federal questions under the U.S. Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and state law protections under the Illinois Religious Freedom Restoration Act, 775 Ill. Comp. Stat. § 35/1, et seq.

10.     This Court has original jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over the related state law claim under 28 U.S.C. § 1367.

11.     This Court can grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65, as well as 775 Ill. Comp. Stat. § 35/20.

12.     This Court can award the requested damages under 28 U.S.C. § 1343 and 775 Ill. Comp. Stat. § 35/20.

13.     This Court can award costs and attorney's fees under 42 U.S.C. § 1988 and 775 Ill. Comp. Stat. § 35/20.

14.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

15.     Plaintiff The Moody Bible Institute of Chicago ("Moody") is an Illinois not-for-profit corporation and Christian higher education and media ministry headquartered in Chicago, Illinois. It is organized and operated "exclusively for religious, educational and charitable purposes." Articles of Amendment & Restated Articles to the Articles of Incorporation, a true and correct copy attached as **Exhibit 1**. Moody asserts its own rights and the rights of its students.

16.     Defendant Board of Education of the City of Chicago is the government body responsible for the supervision and management of Chicago Public Schools ("Board" or "Chicago Public Schools"). The Board exercises final decision-making and policymaking authority for Chicago Public Schools, including whether to enter into student-teacher agreements with institutes of higher education like Moody. 105 Ill. Comp. Stat. 5/34-2 & 5/34-18. The Board "may sue and be sued in all courts and places where judicial proceedings are had." 105 Ill. Comp. Stat. 5/34-2.

## FACTUAL ALLEGATIONS

**A.    Moody's Religious Founding, Mission, and Beliefs.**

17.    The Moody Bible Institute of Chicago was founded in 1886 by Christian evangelist and teacher Dwight L. Moody.

18.    Moody is an accredited institution of higher education and media ministry whose core mission is to proclaim the gospel and equip people to be biblically grounded, practically trained, and to engage the world through gospel-centered living.

19.    Moody has four schools: Moody Bible Institute Undergraduate School; Moody Aviation—Spokane; Moody Theological Seminary and Graduate School; and Moody Online.

20.    Through its four schools, Moody offers biblically focused higher education to more than 2,300 students.

21.    Moody's main campus is strategically located in downtown Chicago and offers many in-person degree programs, including degrees in elementary education, biblical studies, communications, human services, intercultural studies, missional leadership, theology, and more.

22.    In addition to its schools, Moody has three ministries sharing Gospel content through broadcast and digital channels, book publishing, and daily Bible devotionals.

23.    Moody Publishers resources the Church's work of discipling all people. Since its founding, Moody Publishers has distributed more than 300 million books in over 71 languages and 130 countries around the world, spanning from Bible commentary and reference to spiritual and relational growth.

24.    Moody Global Media leverages Moody Radio—one of the oldest Christian radio networks in the United States having aired its first broadcast in

4

1926—to reach millions of listeners, while also leveraging digital platforms such as podcast networks and internet stations in both English and Spanish to address today's issues from a biblical worldview and helping listeners grow in their journey with Jesus Christ.

25.     *Today in the Word* is a daily Bible devotional written by Moody Bible Institute faculty. Each issue includes a study on a book of the Bible or topic, "go deeper" articles, and answers to Bible questions. Available in print, online, email, or by app, its goal is to help readers better understand and apply God's Word to their lives.

26.     Through all its ministries, Moody shares the truth and hope of Jesus Christ with the world.

27.     Moody's religious beliefs therefore drive and form the foundation for everything it does.

28.     As a Christian organization, Moody believes the Bible is the inerrant Word of God and the final authority for all matters of faith, worship, and personal conduct.

29.     It also believes what the Bible teaches about humanity: every person is loved by God, made in His image, and therefore worthy of dignity and respect without regard to individual giftedness, identity, gender, or life circumstances.

30.     Moody's Doctrinal Statement reflects its historic doctrinal position and explains its sincerely held Christian beliefs:

<u>Article I.</u> God is triune, one Being eternally existing in three co-equal Persons: Father, Son, and Holy Spirit; these divine Persons, together possessing the same eternal perfections, work inseparably and harmoniously in creating, sustaining, and redeeming the world.

<u>Article II.</u> The Bible, including both the Old and New Testaments, is a divine revelation, the original autographs of which were verbally inspired by the Holy Spirit.

5

<u>Article III.</u> Jesus Christ is the image of the invisible God, which is to say, He is Himself very God; He took upon Himself our nature, being conceived by the Holy Spirit and born of the Virgin Mary; He died upon the cross as a substitutionary sacrifice for the sin of the world; He arose from the dead in the body in which He was crucified; He ascended into heaven in that body glorified, where He is now our interceding High Priest; He will come again personally and visibly to set up His kingdom and to judge the quick and the dead.

<u>Article IV.</u> Man was created in the image of God but fell into sin, and, in that sense, is lost; this is true of all men, and except a man be born again he cannot see the kingdom of God; salvation is by grace through faith in Christ who His own self bore our sins in His own body on the tree; the retribution of the wicked and unbelieving and the rewards of the righteous are everlasting, and as the reward is conscious, so is the retribution.

<u>Article V.</u> The Church is an elect company of believers baptized by the Holy Spirit into one body; its mission is to witness concerning its Head, Jesus Christ, preaching the gospel among all nations; it will be caught up to meet the Lord in the air where He appears to set up His kingdom.

Excerpts of Moody Employee Info. Guide at 5, a true and correct copy attached as **Exhibit 2**.

31.     To expand on certain theological topics related to its Doctrinal Statement, Moody has also adopted "Positional Statements," including a statement on human sexuality and marriage. Ex. 2 at 7–8.

32.     As explained in that statement, Moody believes that "God created humanity in His image as male and female"; that "God designed marriage to be a monogamous, permanent, committed relationship between a male and a female"; and that "the Bible teaches that any type of sexual activity outside the God-ordained marriage of male and female is sinful." Ex. 2 at 7–8.

6

**B.     Moody's Religious Hiring Practices.**

33.     Moody strives to be a community of caring Christians dedicated to helping each other grow toward Christian maturity and cultivating attitudes and conduct that are consistent with Scripture.

34.     Moody therefore requires that "each employee has committed his or her life to Jesus Christ and Christian service." Ex. 2 at 4.

35.     All of Moody's employees are its "ambassadors," "responsible for the outward image of [Moody's] ministries and their integrity in the eyes of the world." Ex. 2 at 3.

36.     Accordingly, to be hired and work at Moody, one must hold religious beliefs that are consistent with Moody's Doctrinal and Positional Statements.

37.     All employees must also conduct themselves in a manner that is consistent with the ministry's religious beliefs.

38.     As explained in Moody's Community Standards, "[t]he Bible clearly presents certain absolutes of moral behavior." These include active participation in a local church, loving all people, and refraining from certain prohibited practices such as having sex outside of biblical marriage and engaging in homosexual or transgender behavior, among other things. Ex. 2 at 6.

39.     Moody has established Community Standards based on biblical standards of conduct, and Moody expects all employees to follow these biblical absolutes "at work and away from the workplace at all times," because living a lifestyle aligned with biblical principles is "essential" to showing commitment to Jesus Christ and Christian service "to fellow employees, to [Moody] students, and to the outside world." Ex. 2 at 4–6.

40.     These religious requirements and expectations help ensure that anyone who interacts with the ministry encounters Christ not just in what is taught

in its classrooms, radio and media broadcasts, and publications, but also in the lives of Moody's messengers and representatives.

41.     Consistent with these expectations, Moody's various job descriptions reflect spiritual responsibilities.

42.     For example, school faculty, including those in the Education Department, are expected to integrate faith into all aspects of their teaching, to continue developing in their own faith, and to mentor students both academically and spiritually.

43.     The Dean of Student Care and Conduct must collaborate with faculty and staff to maintain a living and learning environment that both encourages students' academic success and maturity in Christ.

44.     Admissions Counselors are expected to exhibit an enthusiastic commitment to the school's religious beliefs and mission because they are the primary contact for prospective students and publicly represent the school at college fairs, conferences, and other recruitment events.

45.     Acquisition Editors for Moody Publishers must have a strong theological grounding and ensure that all content reflects the mission, vision, and values of Moody, with a special emphasis on biblical orientation, accuracy, professionalism, and achievement of ministry objectives.

46.     And the Director of Radio must develop and execute a strategic vision for Moody Radio that aligns with Moody's religious mission and values and is expected to have a strong demonstrated knowledge of the Bible, theology, doctrine, and the leading issues facing Christians today.

47.     Regardless of position, all employees are expected to engage and interact with fellow employees, students, and the rest of the world in ways that accurately reflect Moody's beliefs and biblical foundation.

48.     All employees are expected to "always be prepared to give an answer to everyone who asks [them] to give the reason for the hope that [they] have" in Jesus Christ, and to do so "with gentleness and respect." 1 Peter 3:15 (NIV).

49.     Having Christian employees also ensures that Moody students are surrounded by an uplifting, faithful community of Christ-focused faculty and mentors that supports and strengthens their Christian faith.

50.     Indeed, in keeping with its Christian purpose and mission, Moody strives for students to develop their relationship and commitment to Jesus Christ through knowledge of the Bible, through spiritual discipline and obedience, and through the cultivation of a maturing Christian lifestyle and worldview.

51.     Thus, to be considered for admission to Moody, applicants must have been a Christian for at least one year and actively participate in a Protestant church.

52.     Students must also adhere to and support Moody's Doctrinal Statement and its beliefs.

53.     And Moody students must follow certain standards of conduct based on the teaching and principles of Scripture, seeking to develop personal holiness and discipline. Under these standards, students must refrain from tobacco, alcohol, illegal drugs, and sexual promiscuity, among other things.

54.     Moody's mission to help students grow in their faith and obedience to the teachings of Scripture would be severely undermined if Moody were forced to hire employees who reject its religious beliefs and mission.

55.     By requiring all employees to share and live out its beliefs, Moody maintains an internal community of co-believers who can convincingly communicate its Christian beliefs and message—through both word and deed—to students and the rest of the world.

56.     Another reason Moody requires every employee to share and live out its faith is because every employee is essential to forming Moody's faith community inwardly (toward other employees), which contributes to the success of the ministry outwardly (toward the community).

57.     Keeping an internal community of coreligionists facilitates discipleship among employees, making Moody a place of Christian fellowship and community.

58.     All employees have inward-facing responsibilities to support each other in their Christian faith by providing biblical guidance and encouragement, praying for one another, and holding each other spiritually accountable.

59.     In addition, all full-time employees are expected to attend weekly chapel services and devotions and are encouraged to serve others through mission trips and other ministry projects.

60.     This spiritually supportive environment helps employees overcome and avoid sinful habits, behaviors, and temptations. *See* Proverbs 27:17 (NIV) ("As iron sharpens iron, so one person sharpens another.").

61.     Employing coreligionists facilitates the Bible's commands that Christians should "be perfectly united in mind and thought" (1 Corinthians 1:10); "encourage one another daily" so that "none of you may be hardened by sin's deceitfulness" (Hebrews 3:13); and "carry each other's burdens" to "fulfill the law of Christ" (Galatians 6:2).

62.     Moody's spiritually supportive and encouraging work environment is a central reason employees want to work there.

## C.    Moody's Elementary Education Program.

63.     Moody offers a bachelor's degree in elementary education at its Chicago campus, providing professional teacher training that equips students to teach in both public and private schools.

64.    Students pursuing an elementary education degree must fulfill a minimum number of classroom-observation, practicum, and student-teaching hours, both to satisfy Moody course requirements and to qualify for a Professional Education License under Illinois Law (i.e., an Illinois teaching certification).

65.    During their freshman and/or sophomore years, students pursuing an elementary education degree must complete at least 10 hours of classroom observation in a public-school setting and at least 10 hours in a Christian-school setting, totaling 20 hours. They are expected to observe the learning environment, students' attitudes, teacher-student engagement, and classroom management techniques, among other things.

66.    Students pursuing an elementary education degree must also complete practicums during their junior and senior years.

67.    The Junior Practicum is a clinical experience to provide practice and insight into the nature of elementary school teaching through classroom observation and teaching and interaction with teachers.

68.    The Senior Practicum is a final preparation experience before student teaching to provide continued insight into the nature of, and expectations for, elementary school classrooms.

69.    Students pursuing an elementary education degree must also complete a semester of student-teaching, which is a thirteen-week, full-day clinical experience in classroom teaching and observation.

70.    Although the student-teaching requirement is typically completed during the final semester of the student's senior year, students usually must submit their student-teaching requests during their junior year to ensure placement.

71.    Because students fulfill their observation, practicum, and student-teaching requirements in a variety of school settings, Moody instructs them to abide

11

by all rules and regulations of the cooperating school where they are placed—and Moody's students make every effort to do so.

**D.    The State Approves Moody's Elementary Education Program.**

72.    Moody's elementary education degree program is accredited by the Association of Christian Schools International, through which graduates are certified to teach core subjects in Christian schools locally, nationally, and globally.

73.    But for graduates to qualify for a Professional Education License, which is required to be a full-time teacher in Illinois public schools, a teacher preparation program must be approved by the Illinois State Board of Education. *See* 105 Ill. Comp. Stat. 5/21B-20.

74.    Moody sought Illinois state approval of its elementary education degree program because that would be beneficial to the school and increase employment opportunities for graduates by allowing them to pursue careers in public schools as well as private schools that require a Professional Education License.

75.    In August 2021, Moody began the multi-year process of obtaining state approval by notifying the Illinois State Superintendent of Education that it was seeking approval of its elementary education degree program as a state-approved "educator preparation program." *See* 105 Ill. Comp. Stat. 5/21B-105(a) ("Application for recognition of the school or institution as an educator preparation institution must be made to the State Board of Education.").

76.    After submitting all required paperwork and information—and twice appearing before the State Educator Preparation and Licensure Board—Moody's elementary education program was approved by the Illinois State Board of Education in January 2024.

77.     Moody has since implemented the state-approved elementary education degree program for the 2025–26 school year, so that incoming freshmen will be eligible to sit for the Illinois state teaching licensure exam (grades 1–6) if they successfully complete the program, including its student teaching component.

78.     Students graduating from Moody's state-approved elementary education program will be eligible for teaching positions in Illinois public schools, as well the increasing number of private schools that make state licensure a condition of employment, enhancing their job prospects and employability.

79.     State approval further demonstrates that Moody's elementary education program meets rigorous professional and regulatory standards, strengthening Moody's reputation and ability to attract students.

80.     And state approval opens doors to other opportunities that would not otherwise be available to Moody and its students, such as participating in Chicago Public Schools' Pre-Service Teaching Program.

81.     In fact, the Illinois State Board of Education highlighted the importance of Moody participating in Chicago Public Schools' student-teaching program when considering whether to grant state approval.

82.     Members of the State Educator Preparation and Licensure Board specifically asked Moody whether its students would fulfill their classroom observation, practicum, and/or student-teaching requirements at Chicago Public Schools, in addition to private schools.

83.     One member expressed "concern" about whether Moody could provide its students with "an authentic understanding of CPS" without doing so, wondering if Moody "had a firm understanding" of the "current inequities that exist in CPS." Minutes from Illinois State Educator Preparation and Licensure Board Meeting (Dec. 1, 2023) at 7, a true and correct copy attached as **Exhibit 3**.

84.    Another "clarified" that the questions were meant "to get a sense of whether [Moody's] program will provide a diverse and multicultural experience for students." Ex. 3 at 6–7.

85.    Moody responded to these questions and concerns by noting that it could not develop any public-school relationships and protocols—including with Chicago Public Schools—until its program received state approval. Ex. 3 at 7.

86.    So while it had not yet partnered with Chicago Public Schools, Moody explained that it planned to do so upon receiving state approval. Ex. 3 at 7.

**E.    Chicago Public Schools Excludes Moody from its Student-Teaching Program.**

87.    Chicago Public Schools has over 600 schools, serves more than 325,000 students, and employs over 42,000 people, nearly 23,000 of whom are teachers. CPS, Stats & Facts, a true and correct copy attached as **Exhibit 4**.

88.    Through its Pre-Service Teaching Program, Chicago Public Schools each year "partners with over 50 University programs and welcomes over 1,000 student teachers." CPS Student Teaching Guide, revised Fall 2025, at 2, a true and correct copy attached as **Exhibit 5**.

89.    The program is "designed" to train and recruit "outstanding pre-service teachers by offering a unique urban teaching experience, support and guidance," which in turn can lead to full-time employment. Board Policy 504.10, a true and correct copy attached as **Exhibit 6**.

90.    "Approximately 40%" of Chicago Public Schools' "pre-service teachers become full time employees." Ex. 6 at 1–2.

91.    Despite these recruitment efforts and an operating budget that exceeds $8 billion (Ex. 4 at 12), Chicago Public Schools is unable to fill hundreds of open teacher positions every year.

92.     Moody wants to help fill that need and give its elementary-education students the valuable opportunity of working in the largest public-school district in the state and third largest in the nation.

93.     After receiving state approval for its elementary education program, Moody contacted Chicago Public Schools to participate in its Pre-Service Teaching Program.

94.     Although Moody and its students are fully qualified for and eligible to participate in the program, Chicago Public Schools demands that Moody give up its religious hiring rights as a condition of participation.

95.     Specifically, Chicago Public Schools insists that Moody sign two agreements that contain provisions prohibiting Moody from employing only those who share its religious beliefs and agree to comply with its standards of Christian conduct (the "Employment Provisions").

96.     The first agreement is a "Vendor" agreement with "Terms and Conditions of Purchase" stating:

> You agree that in performing under this order you shall not fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to compensation, or other terms, conditions, or privileges of employment because of race, color, religion, sex, gender identity/expression, sexual orientation, age, disability, or national origin or to limit, segregate, or classify employees or applicants for employment in any way that would deprive or tend to deprive any individual from equal employment opportunities or otherwise adversely affect an individual's status as an employee because of such person's race, color, religion, sex, gender identity/expression, sexual orientation, age, disability or national origin. You also agree to submit in writing, an affirmative action plan demonstrating your compliance with equal employment opportunity laws and Chicago Public Schools policy requiring equal employment opportunity to all."

Vendor Purchase Order Terms & Conditions, a true and correct copy attached as **Exhibit 7**.

97.     The second agreement is a "Student Teaching Internship Agreement" that contains nearly identical language stating that Moody shall not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, or other terms, conditions, or privileges of employment, because of such individual's race, color, national origin, religion, sex, gender identity/expression, sexual orientation, age, or disability." Student Teaching Internship Agreement, a true and correct copy attached as **Exhibit 8**.

98.     But as a religious organization, Moody has a legally protected right to employ persons who share its religious beliefs and agree to comply with its religiously based standards of conduct. *See* U.S. Const., Amend. I; 42 U.S.C. § 2000e-1(a) (religious exemption from Title VII); 775 Ill. Comp. Stat. 5/2-101(B)(2) (religious exemption from employment nondiscrimination provisions in Illinois Human Rights Act); Chicago Municipal Code § 6-10-080 (religious exemption from Chicago Human Rights Ordinance).

99.     So Moody raised concerns about the Employment Provisions in July 2025, asking Chicago Public Schools if it could modify the language to acknowledge and allow Moody's legally protected right to hire coreligionists. *See* Email Correspondence Between Moody and CPS at 8, a true and correct copy attached as **Exhibit 9**.

100.    Chicago Public Schools refused to make any modification, insisting it cannot "accommodate language that permits discrimination" because "CPS maintains a strict district-wide non-discrimination policy." Ex. 9 at 8.

101.    It said the Employment Provisions "align[ ]" with Chicago Public Schools' comprehensive nondiscrimination policy, "which prohibits discrimination based on constitutionally and federally protected categories, including religion, sexual orientation, and gender identity (encompassing gender identity and expression)." Ex. 9 at 5.

102.    Although Chicago Public Schools said it "respect[s] Moody's standing as a religious institution and recognizes its right to operate in accordance with its beliefs," it reiterated its view that "any program or agreement involving the District must align with District policy and uphold our commitment to maintaining a safe and inclusive learning and working environment for all individuals." Ex. 9 at 5.

103.    Still, Moody hoped it could persuade Chicago Public Schools to make the appropriate accommodation, given that the United States Constitution and federal, state, and local laws all permit and protect Moody's employment practices. So Moody proposed a written amendment to the Employment Provisions that would "recognize Moody is afforded certain exemptions and protections regarding nondiscrimination laws." Ex. 9 at 3.

104.    Under Moody's proposed amendment, the following language would have been added to the end of the Employment Provisions:

> [Moody] qualifies and executes the Agreement and Terms and Conditions with the understanding of the parties that it acts in a manner permitted by applicable law, including any exemptions and protections afforded by virtue of [Moody's] status as a faith-based religious institution, and such actions shall not subject it to sanctions from the Board.

Proposed Amendment to Student Teaching Internship Agreement and Vendor Terms and Conditions, a true and correct copy attached as **Exhibit 10**.

105.    Chicago Public Schools rejected the proposed amendment and again refused "to modify the non-discrimination language as requested." Ex. 9 at 1.

106.    Even though Chicago Public Schools conceded "certain exemptions may exist for religious institutions in their own practices," it insisted that Moody and its students could not participate in the Program if Moody is "unable to align" its practices with the Employment Provisions. Ex. 9 at 1.

17

107.    In short, Chicago Public Schools excluded Moody and its students because Moody exercises its right to hire coreligionists—i.e., those who share and live out its religious beliefs.

108.    Moody and its students are otherwise fully qualified for and eligible to participate in the Pre-Service Teaching Program. They satisfied—and still satisfy— all other terms and conditions required for participation.

109.    Moody and its students have thus been excluded from participation in the Program specifically on account of their religious character and exercise.

**F.      Chicago Public Schools Does Not Enforce its Nondiscrimination Policy Equally or Pursue its Interests Evenhandedly.**

110.    Chicago Public Schools excludes Moody and its students from the Pre-Service Teaching Program because it claims to have a "strict district-wide non-discrimination policy" and asserts an interest in "maintaining a safe and inclusive learning and working environment for all individuals." Ex. 9 at 5, 8.

111.    But Chicago Public Schools does not enforce this employment nondiscrimination policy equally, nor does it pursue its interests evenhandedly.

112.    Chicago Public Schools has allowed other universities and colleges to participate in the Pre-Service Teaching Program even though they have similar hiring practices to Moody. *See* CPS Approved University Partners, a true and correct copy attached as **Exhibit 11**.

113.    For example, one religious college participating in the Program says its mission is to "provide a Biblically informed liberal arts education in the Reformed tradition" and that "[e]mployees must sign a statement acknowledging support of the Mission of the College." It further states that "[c]ompliance with [the college's] mission, principles, and views are considered a bona fide occupational qualification

and consideration impacts the employment process." Trinity Christian College, About Us, Jobs, https://perma.cc/GWW4-AJET.

114. Chicago Public Schools also allows another university to participate in the Program even though the university's nondiscrimination statement says it "reserves the right to give preference in employment based on religion." Concordia University Chicago, About Us, Employment, https://perma.cc/S8HD-VF92.

115. By allowing these other colleges and universities to participate in the Program, Chicago Public Schools demonstrates that it selectively enforces its employment nondiscrimination policy.

116. What's more, despite claiming to have a "strict district-wide non-discrimination policy," Ex. 9 at 8, that forbids any employment discrimination based on "race, color, religion, sex, gender identity/expression, sexual orientation, age, disability, or national origin," Ex. 7 at 2; Ex. 8 at 2, Chicago Public Schools allows certain hiring preferences based on protected classes, demonstrating that it selectively pursues its interests in enforcing its employment nondiscrimination policy.

117. For example, Chicago Public Schools has implemented an "Equity Framework" that promotes "set[ting] targets for hiring and retaining Black, Brown and Indigenous staff." Excerpts of CPS Equity Framework at 6, a true and correct copy attached as **Exhibit 12**.

118. Chicago Public Schools similarly offers a "Great Expectations Mentoring Program" for current employees that is "designed to advance African American male and Latinx male and female CPS educational leaders to the next stage of their careers." CPS, Office of Equity, Great Expectations Mentoring Program, a true and correct copy attached as **Exhibit 13**.

119. Similarly, the Board has formally adopted a "Culturally Responsive Education and Diversity" policy that addresses employment practices and directs

Chicago Public Schools "to recruit, hire, promote, and retain a diverse workforce that reflects the student population." Board Policy 102.2, a true and correct copy attached as **Exhibit 14**.

120.    While Chicago Public Schools may believe the policies and practices discussed in Paragraphs 116–119 and in Exhibits 12, 13, and 14 serve important values and purposes, they demonstrate that Chicago Public Schools does not strictly apply its nondiscrimination policy against its own employment practices.

### G.    Chicago Public Schools' Policy and Actions have Damaged—and are Irreparably Harming—Moody and its Students.

121.    Chicago Public Schools has made clear that it will not allow Moody and its students to participate in the Pre-Service Teaching Program unless Moody agrees to abandon its faith-based employment practices.

122.    But Moody's faith-based practice of employing only those who share and live out its faith is rooted in its sincerely held religious beliefs and essential to its religious identity, mission, and message.

123.    Chicago Public Schools has thus excluded Moody and its students because of their religious character and exercise.

124.    Moody has students pursuing an elementary education degree who are ready and able to fulfill their classroom-observation and student-teaching requirements in Chicago Public Schools, and desire to do so.

125.    Those students must now look elsewhere for public school classroom observation and student-teaching placements.

126.    Moody officials likewise must expend valuable time and resources identifying and securing other partnerships and placements because of Chicago Public Schools' actions.

127.    Such alternative placements are less desirable and/or significantly less convenient for many reasons, including their distance from Moody's downtown Chicago campus and not being accessible with public transportation.

128.    Moody's exclusion from the Program has harmed and will continue to harm the reputation and desirability of Moody's elementary education degree program, causing it to lose students who would otherwise attend Moody and pursue an elementary education degree there.

129.    As Chicago Public Schools itself explains, "[s]tudent teaching in Chicago Public Schools offers an unparalleled opportunity to grow as an educator in one of the most diverse, dynamic urban districts in the country." Chicago Public Schools, Student Teachers, https://perma.cc/D2XH-8U8B.

130.    Students who participate "gain real-world classroom experience, work alongside passionate mentors, and make a tangible impact on students' lives—often in the very communities that need it most." *Id.*

131.    Student participation in the Program also enhances their job prospects and employability, especially if they wish to live and work in the Chicago area (as many Moody students do).

132.    Moreover, for students from enrolled universities, Chicago Public Schools offers a year-long program that allows student teachers to complete their fieldwork and student teaching in "one streamlined experience" and to "[r]eceive a stipend, 1:1 recruiter support, and job placement priority." *Id.*

133.    And when students participating in the Program "approach graduation/program completion, CPS Talent team members support with resume workshops and career/hiring fairs to ensure a smooth transition from training to full time teaching at CPS." Ex. 5 at 2.

134.    Student teachers in "high-need subjects" may be "eligible for an early offer of employment even before program completion." Ex. 5 at 2.

135. And as noted, "approximately 40%" of Chicago's "pre-service teachers become full time employees." Ex. 6 at 1–2.

136. Defendant's actions, policy, and practice have therefore harmed Moody's current and future elementary education students by decreasing their chances of obtaining a teaching job upon graduation, either in Chicago Public Schools or other schools for which gaining experience through the Pre-Service Teaching Program would have been viewed favorably.

137. Defendant's actions, policy, and practice have likewise caused Moody reputational harm by conveying to prospective and current students that an elementary education degree from Moody will not provide the students with the same opportunities as are available at other colleges and universities can and will diminish their job prospects.

138. Defendant's actions, policy, and practice have also put Moody to an impossible and unconstitutional choice: (a) adhere to its religious beliefs and faith-based employment practices and be excluded from Chicago Public Schools' Pre-Service Teaching Program; or (b) abandon its religious beliefs and faith-based employment practices and alter its religious identity, mission, and message.

139. That Hobson's choice forces Moody to choose between its fundamental rights and participation in an otherwise available government benefit program.

140. The daily deprivation of Moody's and its students' constitutional rights causes irreparable harm.

141. Moody and its students have no adequate remedy at law for the ongoing constitutional violations and will continue to suffer irreparable harm.

142. Moody and its students need declaratory and injunctive relief to protect their ability to exercise their constitutional rights while participating in a public program just like everyone else.

143.    An injunction protecting the constitutional rights of Moody and its students outweighs any harm to Defendant and benefits the public interest.

144.    The requested declaratory and injunctive relief is warranted in addition to damages for the past and ongoing violations.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Free Exercise Clause
### (U.S. Const., Amend. I; 42 U.S.C. § 1983)

145.    Moody incorporates by reference paragraphs 1–144.

146.    Moody exercises its religion in various ways, including by employing only those who share and live out its religious beliefs.

147.    Moody's students also exercise their religion in various ways, including by selecting and attending a Christian college with faculty and staff that share their religious beliefs and worldview.

148.    Defendant substantially burdens Moody's and its students' religious exercise by requiring that Moody comply with the Employment Provisions and forfeit its religiously based hiring practices as a condition to participating in Chicago Public Schools' Pre-Service Teaching Program.

149.    The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988).

150.    So Defendant cannot disqualify otherwise eligible religious observers from government programs or benefits, including participation in the Pre-Service Teaching Program, "solely because of their religious character," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017), or "on the bases of their religious exercise," *Carson v. Makin*, 596 U.S. 767, 789 (2022).

151.   Chicago Public Schools' Pre-Service Teaching Program is a public program and benefit.

152.   Moody and its students are otherwise eligible and qualified to participate in the Program.

153.   "Regardless of how the benefit and restriction are described," Defendant's actions, policy, and practice "identif[ies] and exclude[s]" Moody and its students solely because of their religious character and exercise. *Carson*, 596 U.S. at 789.

154.   The Employment Provisions and Defendant's actions, policy, and practice are not neutral or generally applicable because they target and exclude Moody and its students solely because of their religious character, beliefs, and exercise.

155.   The Employment Provisions and Defendant's actions, policy, and practice are not neutral or generally applicable because they exhibit hostility towards Moody's religious character, beliefs, and exercise.

156.   The Employment Provisions and Defendant's actions, policy, and practice are not neutral or generally applicable because Chicago Public Schools has discretion to grant exemptions from the Employment Provisions and has exercised that discretion. *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).

157.   The Employment Provisions and Defendant's actions, policy, and practice are not neutral or generally applicable because Defendant treats comparable secular activity more favorably than Moody's religious exercise. *Tandon v. Newsom*, 593 U.S. 61 (2021).

158.   The Employment Provisions and Defendant's actions, policy, and practice are not neutral or generally applicable because Chicago Public Schools does not strictly enforce the Employment Provisions against other universities and colleges with employment practices like Moody's.

24

159.    The Employment Provisions and Defendant's actions, policy, and practice also are not neutral or generally applicable because Defendant allows for certain hiring preferences in its own employment practices yet strictly enforces the Employment Provisions against Moody's faith-based employment practices.

160.    The Employment Provisions and Defendant's actions, policy, and practice trigger strict scrutiny but neither serve a compelling interest nor are narrowly tailored to achieve any purported compelling interest.

161.    The Employment Provisions and Defendant's actions, policy, and practice therefore violate the Free Exercise Clause of the First Amendment, as applied to Moody's faith-based practice of employing only those who share and live out its religious beliefs.

**COUNT II**
**Violation of the Religion Clauses:**
**Church Autonomy and the Ministerial Exception**
**(U.S. Const., Amend. I; 42 U.S.C. § 1983)**

162.    Moody incorporates by reference paragraphs 1–144.

163.    The Religion Clauses of the First Amendment protect the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

164.    This right to religious autonomy protects Moody's decisions about which employees are best suited to advance its religious mission and purpose.

165.    The ministerial exception is one component of this autonomy and forbids Defendant from interfering with Moody's employment decisions about "who will personify its beliefs." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012).

25

166.    Nor may Defendant penalize Moody for its ministerial hiring decisions by withholding otherwise available government programs or benefits from Moody and its students due to those decisions.

167.    Many of Moody's employees qualify as "ministerial" employees under Supreme Court precedent because they lead the ministry, conduct important religious ceremonies or rituals, or serve as a messenger of its faith by sharing the Gospel with and teaching others—through word and deed—about Jesus Christ and the Bible. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 754 (2020).

168.    To the extent that any of Moody's employees do not qualify as "ministerial" employees, the right to religious autonomy still protects the ministry's ability to prefer coreligionists for those positions because that preference is rooted in Moody's sincerely held religious beliefs and practices. *See, e.g.*, *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002) (religious institution has right to make "personnel decision[s] based on religious doctrine" even when the decision does not involve a ministerial employee).

169.    The Employment Provisions and Defendant's actions, policy, and practice impermissibly interfere with Moody's internal affairs by requiring that Moody surrender its right to religious autonomy (often referred to as the church-autonomy doctrine) to participate in the Pre-Service Teaching Program, a valuable government program and benefit.

170.    The Employment Provisions and Defendant's actions, policy, and practice are therefore unconstitutional under the Religion Clauses of the First Amendment, as applied to Moody's faith-based practice of employing only those who share and live out its religious beliefs.

## COUNT III
## Violation of the Free Speech Clause:
### Expressive Association
### (U.S. Const., Amend. I; 42 U.S.C. § 1983)

171.    Moody incorporates by reference paragraphs 1–144.

172.    The First Amendment protects the right of people "to associate with others in pursuit of . . . educational [and] religious . . . ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (citation modified).

173.    When an association expresses a collective message, the First Amendment prohibits the government from forcing the association to admit those who reject that message, seek to change it, or express a contrary view.

174.    Moody is an expressive association because it employs and associates with only likeminded believers to fulfill its religious purposes and to express its religious beliefs and message to employees, students, and the rest of the world.

175.    The Employment Provisions and Defendant's actions, policy, and practice force Moody and its students to surrender their right to associate with only like-minded believers who share and live out their faith to participate in the Pre-Service Teaching Program, a valuable government program and benefit.

176.    This forces Moody and its students to expressively associate with people who do not hold the same beliefs and cannot express the same message.

177.    The Employment Provisions and Defendant's actions, policy, and practice operate as an unconstitutional condition that triggers strict scrutiny, but they neither serve a compelling interest nor are narrowly tailored to achieve any purported compelling interest.

178.    The Employment Provisions and Defendant's actions, policy, and practice therefore violate the First Amendment right to expressive association, as applied to Moody's faith-based practice of employing only those who share and live out its religious beliefs.

**COUNT IV**
**Violation of the Establishment Clause:**
**Denominational Favoritism**
**(U.S. Const., Amend. I; 42 U.S.C. § 1983)**

179.    Moody incorporates by reference paragraphs 1–144.

180.    "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

181.    The Establishment Clause therefore forbids Defendant from preferring and favoring certain religious denominations or beliefs over others.

182.    The Employment Provisions, as enforced by Defendant, create a denominational preference by excluding Moody and its students from the Pre-Service Teaching Program while allowing other religious institutions with similar hiring practices to participate.

183.    The Employment Provisions and Defendant's actions, policy, and practice also impermissibly "distinguishes among religions based on theological differences," since a religious organization's decision to limit employment to only those who share and live out its faith is "fundamentally" a "theological choice[ ] driven by the content of different religious doctrines." *Cath. Charities Bureau, Inc. v. Wisc. Labor & Industry Rev. Comm'n*, 605 U.S. 238, 252, 254 (2025).

184.    The Employment Provisions and Defendant's actions, policy, and practice therefore trigger strict scrutiny but neither serve a compelling interest nor are narrowly tailored to achieve any purported compelling interest.

185.    The Employment Provisions and Defendant's actions, policy, and practice therefore violate the Establishment Clause of the First Amendment, as applied to Moody's faith-based practice of employing only those who share and live out its religious beliefs.

**COUNT V**
**Violation of the Equal Protection Clause**
**(U.S. Const., Amend. XIV; 42 U.S.C. § 1983)**

186.    Moody incorporates by reference paragraphs 1–144.

187.    The Equal Protection Clause prohibits the government from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

188.    The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike" and prohibits the government from creating "arbitrary or irrational" distinctions between classes of people. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 446 (1985).

189.    The Equal Protection Clause thus prohibits discrimination on the basis of religion and prohibits Defendant from excluding Moody and its students from the Pre-Service Teaching Program because of Moody's religious character, beliefs, or exercise.

190.    By enforcing the Employment Provisions against Moody's religious employment practices, Defendant demands that Moody surrender its religious character, beliefs, and exercise to participate in the Program.

191.    The Employment Provisions and Defendant's actions, policy, and practice also treat Moody and its students less favorably than similarly situated colleges and universities.

192.    The Employment Provisions and Defendant's actions, policy, and practice trigger strict scrutiny but neither serve a compelling interest nor are narrowly tailored to achieve any purported compelling interest.

193.    The Employment Provisions and Defendant's actions, policy, and practice therefore violate the Equal Protection Clause of the Fourteenth Amendment, as applied to Moody's faith-based practice of employing only those who share and live out its religious beliefs

29

## COUNT VI
### Violation of the Illinois Religious Freedom Restoration Act
### (775 Ill. Comp. Stat. § 35/1, et seq.)

194.    Moody incorporates by reference paragraphs 1–144.

195.    Under the Illinois Religious Freedom Restoration Act, Defendant "may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." 775 Ill. Comp. Stat. § 35/15.

196.    Moody exercises its religion in various ways, including by employing only coreligionists—those who share and live out the ministry's religious beliefs.

197.    Moody's students also exercise their religion in various ways, including by selecting and attending a Christian college with faculty and staff that shares their religious beliefs and worldview.

198.    Defendant substantially burdens Moody's and its students' religious exercise by requiring that Moody comply with the Employment Provisions and forfeit its religiously based hiring practices as a condition to participating in the Pre-Service Teaching Program, a valuable government program and benefit.

199.    The Employment Provisions and Defendant's actions, policy, and practice neither serve a compelling interest nor are narrowly tailored to achieve any purported compelling interest.

200.    The Employment Provisions and Defendant's actions, policy, and practice therefore violate the Illinois Religious Freedom Restoration Act, as applied to Moody's faith-based practice of employing only those who share and live out its religious beliefs.

## **PRAYER FOR RELIEF**

Plaintiff respectfully asks this Court to enter judgment against Defendant and provide the following relief:

(A)     Declare that Chicago Public Schools' enforcement of the Employment Provisions and decision to exclude Moody and its students from the Pre-Service Teaching Program because of Moody's faith-based employment practices violated the First and Fourteenth Amendments to the United States Constitution and the Illinois Religious Freedom Restoration Act.

(B)     Declare that the Employment Provisions, as applied to Moody's faith-based employment practices (e.g., employing those who share and live out its faith), violates the First and Fourteenth Amendments to the United States Constitution and the Illinois Religious Freedom Restoration Act.

(C)     Enter preliminary and permanent injunctive relief prohibiting Defendant, its officers, agents, servants, employees, and attorneys, and any others who are in active concert or participation with the above, from: (i) enforcing the Employment Provisions against Moody's faith-based employment practices; (ii) excluding Moody and its students from Chicago Public Schools' Pre-Service Teaching Program because of Moody's faith-based employment practices; and (iii) otherwise terminating, rescinding, or refusing to enter into any agreements with Moody and its students related to the Program because of Moody's faith-based employment practices.

(D)     Award nominal and compensatory damages.

(E)     Award reasonable costs and attorney's fees.

(F)     Award any other relief this Court deems equitable, just, and proper.

Dated: November 4, 2025

<div style="margin-left: 40%;">

s/ David A. Cortman
David A. Cortman, N.D. Ill. Bar No. 188810
   dcortman@adflegal.org
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774

Ryan Tucker, AZ Bar No. 034382*
   rtucker@adflegal.org
Jeremiah Galus, AZ Bar No. 030469*
   jgalus@adflegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

Jacob Reed, VA Bar No. 97181*
   jreed@adflegal.org
ALLIANCE DEFENDING FREEDOM
Riverside Parkway
Lansdowne, VA 20176
(480) 388-8263

John W. Mauck, IL Bar No. 1797328
   jmauck@mauckbaker.com
Whitman H. Brisky, IL Bar No. 297151
   wbrisky@mauckbaker.com
MAUCK & BAKER, LLC
1 North LaSalle Street, Ste. 3150
Chicago, IL 60602
(312) 726-1243

*Attorneys for Plaintiff*
*\*Pro Hac Vice Application Pending*

</div>

## VERIFICATION OF COMPLAINT

I, Dr. Lisa S. Smith, a citizen of the United States and a resident of Illinois, declare under penalty of perjury under the laws of the United States of America that the factual allegations in this Verified Complaint are true and correct to the best of my knowledge, information, and belief.

Executed on October 24, 2025, in Chicago, Illinois.

Dr. Lisa S. Smith
Program Head and Assistant
Professor of Elementary Education,
The Moody Bible Institute of Chicago