**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**THE MOODY BIBLE INSTITUTE OF CHICAGO**, an Illinois not for profit corporation,

                    Plaintiff,

v.

**BOARD OF EDUCATION OF THE CITY OF CHICAGO**, a body politic and corporate,

                    Defendant.

Case No.: 1:25-cv-13500

Hon. Lindsay C. Jenkins

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 2

    I.  Moody's religious mission and its elementary education program. ................. 2

        A.  Moody's religious beliefs and hiring practices. ........................................... 2

        B.  Moody's elementary education program. ................................................... 4

    II.  CPS bars Moody's elementary education students from the student-teacher program because of Moody's religious practices. ................................. 5

        A.  Illinois approves Moody's elementary education program. ......................... 5

        B.  CPS's student-teacher program. ............................................................. 6

        C.  CPS excludes Moody because of its religious hiring practices. ................... 7

LEGAL STANDARD ............................................................................................ 8

ARGUMENT ...................................................................................................... 9

    I.  Moody is likely to succeed on the merits. ........................................................ 9

        A.  CPS violates the Free Exercise Clause. ................................................... 9

            1.  CPS triggers strict scrutiny because it excludes Moody and its students due to their religious character and exercise. ......................... 9

            2.  CPS also triggers strict scrutiny because the employment provisions are not neutral and generally applicable. ........................... 11

            3.  CPS cannot satisfy strict scrutiny. ...................................................... 13

        B.  CPS violates the church autonomy doctrine by penalizing Moody's faith-based practice of employing coreligionists. ...................................... 14

        C.  CPS also violates Moody's expressive association rights. .......................... 17

        D.  CPS violates Illinois's Religious Freedom Restoration Act by imposing an unjustified substantial burden on Moody. ............................. 18

    II.  Moody satisfies the other preliminary injunction factors. ............................. 19

CONCLUSION ................................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alicea-Hernandez v. Catholic Bishop of Chicago,*
320 F.3d 698 (7th Cir. 2003) ..................................................................... 10, 16, 18

*American Civil Liberties Union of Illinois v. Alvarez,*
679 F.3d 583 (7th Cir. 2012) ............................................................................ 19, 20

*Baumgartner v. City of Chicago,*
759 F. Supp. 3d 868 (N.D. Ill. 2024) ...................................................................... 18

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ........................................................................................... 1, 17

*Bryce v. Episcopal Church in the Diocese of Colorado,*
289 F.3d 648 (10th Cir. 2002) .................................................................................. 16

*Carson v. Makin,*
596 U.S. 767 (2022) ..................................................................... 1, 9, 10, 11

*Christian Legal Society v. Walker,*
453 F.3d 853 (7th Cir. 2006) ........................................................... 17, 19, 20

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ...................................................................................... 12, 13

*Demkovich v. St. Andrew the Apostle Parish, Calumet City,*
3 F.4th 968 (7th Cir. 2021) ................................................................... 10, 16

*Diggs v. Snyder,*
775 N.E.2d 40 (Ill. App. Ct. 2002) ......................................................................... 18

*Elrod v. Burns,*
427 U.S. 347 (1976) .............................................................................................. 19

*Espinoza v. Montana Department of Revenue,*
591 U.S. 464 (2020) ............................................................................................... 9

*Fellowship of Christian Athletes v. San Jose Unified School District Board of
Education,*
82 F.4th 664 (9th Cir. 2023)....................................................................... 13

*Fulton v. City of Philadelphia*,
 593 U.S. 522 (2021) ........................................................................ 1, 11, 12, 13, 14

*Gracehaven, Inc. v. Montgomery County Department of Job & Family Services*,
 No. 3:24-cv-325, 2025 WL 1158079 (S.D. Ohio Apr. 21, 2025) ........................ 11, 16

*Hosanna-Tabor Evangelical Lutheran Church & School. v. Equal Employment
 Opportunity Commission (EEOC)*,
 565 U.S. 171 (2012) ........................................................... 1, 10, 11, 15, 17

*International Ass'n of Fire Fighters, Local 365 v. City of East Chicago*,
 56 F.4th 437 (7th Cir. 2022) ..................................................................... 19

*Intervarsity Christian Fellowship/USA v. University of Iowa*,
 5 F.4th 855 (8th Cir. 2021) ....................................................................... 17

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*,
 344 U.S. 94 (1952) ..................................................................................... 14

*LeBoon v. Lancaster Jewish Community Center Ass'n*,
 503 F.3d 217 (3d Cir. 2007) ....................................................................... 10

*Nken v. Holder*,
 556 U.S. 418 (2009) ................................................................................... 20

*Our Lady of Guadalupe School v. Morrissey-Berru*,
 591 U.S. 732 (2020) ...................................................................... 14, 15, 16

*Reporters Committee for Freedom of the Press v. Rokita*,
 147 F.4th 720 (7th Cir. 2025) ...................................................................... 8

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
 592 U.S. 14 (2020) ..................................................................................... 19

*Seattle's Union Gospel Mission v. Woods*,
 142 S. Ct. 1094 (2022) ............................................................................... 11

*Serbian Eastern Orthodox Diocese for U.S. & Canada v. Milivojevich*,
 426 U.S. 696 (1976) ................................................................................... 16

*Tandon v. Newsom*,
 593 U.S. 61 (2021) ..................................................................................... 12

*Thomas v. Review Board. of Indiana Employment Security Division*,
 450 U.S. 707 (1981) ................................................................................... 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ................................................................. 9, 11

*Watson v. Jones*,
  80 U.S. 679 (1871) ...................................................................... 16

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) .......................................................................... 8

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ............................................................... 16, 18

**Statutes**

105 Ill. Comp. Stat. § 5/21B-20 .......................................................... 5

42 U.S.C. § 2000e-1 ........................................................................ 14

775 Ill. Comp. Stat. § 5/2-101 ......................................................... 14

775 Ill. Stat. Comp. § 35/10 ............................................................. 18

775 Ill. Stat. Comp. § 35/15 ............................................................. 18

775 Ill. Stat. Comp. § 35/5 ............................................................... 18

Chi. Mun. Code § 6-10-080 ............................................................... 14

## INTRODUCTION

Chicago Public Schools (CPS) partners with public and private universities to place undergraduate students in student-teacher positions throughout the city's public schools. But when Moody Bible Institute moved through the steps needed to join CPS's student-teacher program, the process abruptly stopped. Why? Because CPS objects to Moody's religious practice of hiring only those who share its faith.

CPS conditions Moody's access to the student-teacher program on compliance with employment nondiscrimination provisions embedded in the program contracts. But those provisions forbid Moody from hiring employees who share and live out its faith, compromising Moody's Christian character and changing its message. When Moody asked CPS to amend the provisions to acknowledge Moody's religious hiring rights, CPS refused—despite partnering with other schools that have policies like Moody's. Instead, CPS gave Moody an ultimatum: give up its faith-based employment practices or be shut out from the student-teacher program.

That's wrong. The Supreme Court has made clear that the government cannot exclude "religious observers from otherwise available public benefits." *Carson v. Makin*, 596 U.S. 767, 778 (2022). CPS also cannot "deny[] an exception" to Moody "while making them available to others." *Fulton v. City of Phila.*, 593 U.S. 522, 542 (2021). Nor can CPS control who may "personify" Moody's beliefs or otherwise interfere with its expressive association. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000). And the Illinois Religious Freedom Restoration Act prohibits CPS from substantially burdening Moody's and its students' religious exercise without satisfying strict scrutiny, which it cannot do.

1

Make no mistake: CPS's actions hurt everyone. They infringe Moody's and its students' constitutional and statutory rights. They hurt Moody's students by denying them a key credential and employment opportunity. They damage Moody's reputation and academic competitiveness. And they exacerbate the teacher shortage in public schools by cutting off a future source of qualified student-teachers—hurting overwhelmed teachers and underserved public schoolers. The Court should issue a preliminary injunction.

## FACTUAL BACKGROUND

### I. Moody's religious mission and its elementary education program.

#### A. Moody's religious beliefs and hiring practices.

Moody is a Christian ministry headquartered in Chicago. Decl. of Dr. Lisa S. Smith (Smith Decl.) ¶ 3. It shares the truth and hope of Jesus Christ and trains and equips Christians to be mature Christ followers. *Id.*

Moody pursues this mission through schools and media ministries. It offers a biblically focused higher education to over 2,300 students through a fully accredited undergraduate school, distance learning, and a seminary. Its main campus, located in downtown Chicago, offers in-person degrees spanning biblical studies and missional leadership to communications and elementary education. *Id.* ¶ 4.

Moody Publishers, Moody Radio, and *Today in the Word* comprise Moody's media ministries. Moody Publishers resources churches by distributing books, ranging from spiritual growth resources to Bible commentaries. Verified Compl. (VC) ¶ 23. Moody Radio helps millions of listeners understand issues from a biblical viewpoint and grow in their walk with Jesus Christ. *Id.* ¶ 24. And *Today in the Word* is a daily devotional written by Moody faculty, with each issue examining Bible passages and answering Bible questions to help readers better understand and follow God's Word. *Id.* ¶ 25.

All these ministries operate consistently with Moody's religious beliefs, which are reflected in Moody's Doctrinal and Positional Statements. VC ¶¶ 27–31; Smith Decl. ¶¶ 6–8. Moody believes, among other things, that the Bible is the divine Word of God, that every person is created in God's image and therefore worthy of dignity and respect, and that it is the Church's—and Moody's—mission to share the love of Jesus Christ. ECF No. 1-2 at 6. Moody further believes that God created us "male and female," that "God designed marriage to be a monogamous, permanent, committed relationship between a male and a female," and that "any type of sexual activity outside the God-ordained marriage of male and female is sinful." *Id.* at 8–9.

Given its Christian beliefs and mission, Moody expects that "each employee has committed his or her life to Jesus Christ and Christian service." *Id.* at 5. Indeed, every Moody employee is an "ambassador[]" charged with spiritual responsibilities, including upholding Moody's "outward image" and "integrity in the eyes of the world." *Id.* at 4.

As Christian "ambassadors," Moody employees profess Christianity by word and deed. Moody requires its employees to affirm biblical truths consistent with its Doctrinal and Positional Statements, and they must behave in a manner that upholds rather than undermines the ministry's religious beliefs. Smith Decl. ¶ 10. As explained by Moody's Community Standards, "[t]he Bible clearly presents certain absolutes of moral behavior." ECF No. 1-2 at 7. Those absolutes include being active in a local church, refraining from prohibited practices such as sexual immorality, and loving all people. *Id.* This is "essential" to demonstrating Christian beliefs "to the outside world." *Id.* at 5. By requiring its employees to follow biblical principles and standards of conduct, Moody ensures that anyone who interacts with the ministry encounters Christ, not just in what is taught in Moody's classrooms or on its radio broadcasts, but in Moody employees' lives. Smith Decl. ¶ 10.

Consistent with these expectations, Moody's various job descriptions reflect spiritual responsibilities. Smith Decl. ¶ 11. For example, Moody expects its seminary and undergraduate faculty to integrate faith into all aspects of their teaching, to actively develop their own faith, and to mentor their students academically and spiritually in the Christian faith. *Id.* Likewise, the Dean of Student Care and Conduct must collaborate with faculty and staff to maintain an environment that encourages students' academic success and spiritual maturity in Christ. *Id.* ¶ 12. And Moody expects its Acquisition Editors to have a strong theological grounding and ensure that all Moody Publishers' content reflects Moody's mission, vision, and values. *Id.* ¶ 14. But regardless of position or title, Moody expects every employee's professional and personal life to reflect its Christian beliefs. *Id.* ¶ 16.

All employees have inward-facing spiritual responsibilities too. Because Moody's internal faith community affects its outward-facing ministry, Moody expects its employees to disciple one another in the Christian faith and to support each other by providing biblical guidance and encouragement, praying for one another, and holding each other spiritually accountable. *Id.* ¶ 18. Moody also requires all full-time employees to attend weekly chapel services and devotions, and it encourages employees to serve others through mission trips and other ministry projects. *Id.* This faith-centered environment helps employees follow the Bible's commands that Christians should "be perfectly united in mind and thought," "encourage one another daily," and "fulfill the law of Christ." *Id.* ¶ 19 (quoting 1 Corinthians 1:10, Hebrews 3:13, and Galatians 6:2).

### B. Moody's elementary education program.

Moody offers a variety of degree programs that cater to its students' God-given talents. Once such degree is in elementary education, which equips students to teach in private and public schools. Smith Decl. ¶ 21.

4

In addition to other course requirements, elementary education students must meet a minimum number of classroom-observation and student-teaching hours, including in public schools. For example, by the end of their second year, students must observe at least 20 hours of classroom instruction, ten of which must be in a public-school setting. *Id.* ¶ 23. By observing these classes in person, students learn about student-teacher engagement and classroom-management techniques, preparing them for their third- and fourth-year practicums. *Id.* Clinical practicums further prepare students for their capstone project: a semester of full-day student teaching in elementary schools. *Id.* ¶¶ 24–25. Because students complete the semester-teaching requirement during their final semester, they must apply for their preferred school during their junior year to ensure placement. *Id.* ¶ 25.

Moody students do student teaching in various school settings, and Moody instructs them to comply with the host school's or district's rules and policies. *Id.* ¶ 26. Moody students make every effort to do so. *Id.*

## II.  CPS bars Moody's elementary education students from the student-teacher program because of Moody's religious practices.

### A.  Illinois approves Moody's elementary education program.

For graduates to qualify for a Professional Educator License, which is required to be a full-time teacher in Illinois's public schools, *see* 105 Ill. Comp. Stat. § 5/21B-20, a teacher preparation program must be approved by the State Board of Education, *see* 105 Ill. Comp. Stat. § 5/21B-105(a).

Moody first sought State Board approval of its elementary education degree program in 2021. Smith Decl. ¶ 28. It did so to increase employment opportunities for its graduates, since state approval would allow them to pursue careers in public schools and private schools that require a Professional Educator License. *Id.* State Board approval would also strengthen Moody's reputation and ability to attract

students by highlighting how its elementary education program meets rigorous professional and regulatory standards. *Id.* ¶ 32.

After three years and two appearances before the Educator Preparation and Licensure Board, the State Board approved Moody's elementary education program in 2024. *Id.* ¶ 29. Moody implemented the State Board approved program for the 2025-2026 school year. *Id.* ¶ 30. That means students enrolling in the program will now be eligible to sit for the Illinois state teaching licensure exam (grades 1-6) if they complete the program, including its student-teaching component. *Id.* ¶ 31.

When considering whether to approve Moody's program, the State Board emphasized the importance of Moody students participating in CPS's student-teaching program. State Board members stressed that students should have "a diverse and multicultural experience" and asked whether Moody students would fulfill their observation and student-teaching requirements at CPS. ECF No. 1-3 at 7–8. Moody explained that it planned to participate in CPS's student-teaching program upon receiving state approval. *Id.* at 8; *accord* Smith Decl. ¶¶ 34–35.

### B. CPS's student-teacher program.

CPS has a Pre-Service Teaching Program designed to train and recruit undergraduate students as teachers. ECF No. 1-5 at 3. Through this program, CPS partners with 50 universities and enjoys an influx of "over 1,000 student teachers." *Id.* The program offers undergraduate students "a unique urban teaching experience, support and guidance" and often results in offers of full-time employment. ECF No. 1-6 at 2–3. Indeed, approximately 40% of students who complete the program secure a teaching job in the city's public schools. *Id.*

But CPS still faces a teacher shortage. Despite its recruitment efforts and an operating budget that exceeds $8 billion, ECF No. 1-4 at 13, CPS is unable to fill hundreds of teacher positions, VC ¶ 91.

Moody and its students want to help. By joining the student-teaching program, Moody students can aid understaffed public schools while earning valuable experience in the third-largest public-school district in the nation. *Id.* ¶ 92. That's why, after receiving state approval for its elementary education program, Moody contacted CPS to join the student-teacher program. Smith Decl. ¶ 36.

### C.  CPS excludes Moody because of its religious hiring practices.

CPS refused to partner with Moody. Although Moody and its students are qualified to join the student-teacher program, CPS conditions participation on compliance with employment provisions embedded in two contracts, both of which would require Moody to give up its religious hiring practices. Smith Decl. ¶ 36.

The first is a "Vendor" agreement that states Moody "shall not fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to compensation, or other terms, conditions, or privileges of employment because of . . . religion . . . gender identity/expression, [or] sexual orientation . . . ." ECF No. 1-7 at 3. The second is a "Student Teaching Internship Agreement" with a nearly identical provision. ECF No. 1-8 at 3.

But Moody cannot hire nonbelievers without compromising its Christian character and mission. *See* Smith Decl. ¶¶ 17–18. So Moody asked CPS to include an amendment in both contracts acknowledging Moody's legally protected right to hire coreligionists. ECF No. 1-9 at 4–5; ECF No. 10. CPS rejected the proposal. Although CPS admitted "certain exemptions may allow for religious preferences in areas such as hiring," it refused to "accommodate" Moody. ECF No. 1-9 at 6, 9. CPS said the employment provisions "align[]" with its "strict district-wide non-discrimination policy and that Moody could not participate if it was "unable to align" its own employment practices with CPS's policy. *Id.* at 2, 9.

Yet CPS's "strict" nondiscrimination policy is more malleable than it suggests. CPS itself promotes "[s]et[ting] targets for hiring and retaining Black, Brown, and Indigenous staff," ECF No. 1-12 at 12, even though the challenged provisions prohibit employment discrimination based on "race," "color," and "national origin," ECF No. 1-7 at 3; ECF No. 1-8 at 3. It also strives "to recruit, hire, promote, and retain a diverse workforce that reflects the student population"—a population that is over 80% Latino and African American. ECF No. 1-14 at 5; ECF 1-4 at 8. And its Great Expectations Mentoring Program is "[a] pipeline designed to advance African American male and Latinx female [public school] educational leaders." ECF No. 1-13 at 2.

CPS also partners with other schools that have faith-based employment policies like Moody's. Trinity Christian College, for example, considers "[c]ompliance with" its religious "mission, principles, and views" to be "a bona fide occupational qualification." VC ¶ 113. And Concordia University, a Lutheran school, expressly reserves the right to prefer coreligionists in employment. *Id.* ¶ 114

## **LEGAL STANDARD**

To obtain a preliminary injunction, Moody must show (1) a likelihood of success on the merits, (2) a threat of irreparable harm, (3) that the balance of equities tilts in its favor, and (4) that an injunction is in the public interest. *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 729 (7th Cir. 2025) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). In First Amendment cases, the likelihood of success on the merits is often the determinative factor. *Id.*

8

**ARGUMENT**

**I.      Moody is likely to succeed on the merits.**

**A.      CPS violates the Free Exercise Clause.**

CPS's exclusionary policy triggers—and fails—strict scrutiny under the Free Exercise Clause for two reasons. First, the employment provisions exclude Moody and its students from a public benefit—the student-teacher program—because of their religious character and exercise. Second, the employment provisions are neither neutral nor generally applicable because CPS allows exceptions.

**1.      CPS triggers strict scrutiny because it excludes Moody and its students due to their religious character and exercise.**

The Free Exercise Clause forbids "indirect coercion or penalties on the free exercise of religion" just as much as "outright prohibitions." *Carson*, 596 U.S. at 778. And the Supreme Court held three times in five years that the government violates the Free Exercise Clause when it excludes religious observers from "otherwise available public benefits" because of their religious character or exercise. *Id.*; *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020).

In *Trinity Lutheran*, the Supreme Court held that a state could not exclude "otherwise eligible" churches from a playground resurfacing program because of the churches' "religious character." 582 U.S. at 462. In *Espinoza*, the Court held the same for a state program giving tax credits for private-school scholarships. 591 U.S. at 487. The state could not bar "religious schools from public benefits solely because of the religious character of the schools." *Id.* at 476. And in *Carson*, the Court went further. It held that Maine could not exclude religious schools from a tuition-assistance program based on their religious use of state funds. 596 U.S. at 787.

The "unremarkable principles" applied in those cases decide this one. *Id.* at 780 (citation modified).

To begin, CPS's student-teacher program is a *benefit* because it gives students "robust training," helps them fulfill a requirement needed for graduation and state licensure, and opens the door to future employment. ECF No. 1-6 at 2–3. It is a *public* benefit because CPS offers it to any student from an eligible institution. *See id.* at 2. Next, CPS conditions access to the program on Moody forfeiting its religious character and exercise. CPS will not let Moody and its students join unless Moody drops its religious hiring practices and agrees to hire nonbelievers.

Yet central to any religious organization's character is employees who share its religious beliefs and mission—that's part of what makes it *religious. LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (one key factor for whether an organization qualifies as "religious" is "whether its membership is made up by coreligionists"). Religious character also intertwines with religious exercise. For "the content and credibility of a religion's message depends vitally on the character and conduct of its teachers." *Hosanna-Tabor*, 565 U.S. at 201 (Alito & Kagan, JJ., concurring) (citation modified). And a religious organization's "message, of course, is of singular importance." *Alicea-Hernandez v. Cath. Bishop of Chi.*, 320 F.3d 698, 704 (7th Cir. 2003).

Moody illustrates the point. It exists to share Jesus Christ with the world and equip Christians to be mature Christ followers. Smith Decl. ¶ 3. So it charges its employees with spiritual responsibilities like discipling and praying for one another and professing the Christian faith through lifestyles that conform to biblical principles. Such responsibilities demand coreligionists. *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 979 (7th Cir. 2021) (en banc) ("Religion permeates the ministerial workplace in ways it does not in other workplaces."). A nonbeliever can't spiritually mentor others or credibly teach, by word and deed, Moody's Christian

10

beliefs. If CPS compels Moody "to hire employees who fundamentally disagree" with Moody's religious views, that would "extinguish[]" its religious character and thwart its religious exercise. *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (Statement of Alito, J.).

CPS seeks to do just that. It conditions Moody's access to the student-teacher program on compliance with employment provisions that forbid Moody from "select[ing] . . . those who will personify its beliefs." *Hosanna-Tabor*, 565 U.S. at 188. Just like *Trinity Lutheran*, *Espinoza*, and *Carson*, CPS puts Moody to an unconstitutional choice: "participate in an otherwise available benefit program or remain a religious institution." *Trinity Lutheran*, 582 U.S. at 462; *see also Gracehaven, Inc. v. Montgomery Cnty. Dep't of Job & Fam. Servs.*, No. 3:24-cv-325, 2025 WL 1158079, at *3–4 (S.D. Ohio Apr. 21, 2025) (holding that a county impermissibly excluded a religious organization from a foster-care program because of its religious-hiring practices).

While CPS may say Moody is "free to continue operating" as a religious institution, it will only enjoy that freedom "at the cost of automatic and absolute exclusion from the benefits of a public program" for which it is "otherwise fully qualified." *Trinity Lutheran*, 582 U.S. at 462. "Such religious discrimination is "odious to our Constitution," subject to "the strictest scrutiny." *Carson*, 596 U.S. at 779–80 (quoting *Trinity Lutheran*, 582 U.S. at 467).

### 2. CPS also triggers strict scrutiny because the employment provisions are not neutral and generally applicable.

CPS's actions also violate the Free Exercise Clause because they burden Moody's and its students' religious exercise and are not neutral and generally applicable. *See Fulton*, 593 U.S. at 532–33. A law is not generally applicable if it provides a mechanism for individualized exemptions or permits any "secular conduct that undermines the government's asserted interests in a similar way." *Id.*

11

at 533–34; *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (explaining that a government regulation is not generally applicable "whenever [it] treat[s] *any* comparable secular activity more favorably than religious exercise"). Neutrality and general applicability are interrelated, such that failure to meet one likely means that the other is not satisfied. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

CPS fatally undermines its purported interest in excluding Moody—the importance of enforcing its "strict" nondiscrimination policy—in two ways.

*First*, CPS promotes setting "targets for hiring and retaining Black, Brown and Indigenous staff"—despite the employment provisions banning hiring based on race, color, and ethnicity. ECF No. 1-12 at 12; ECF No. 1-7 at 3. Likewise, CPS offers a mentorship program for current employees designed to advance the careers of "African American male and Latinx male and female CPS educational leaders," ECF No. 1-13 at 2, thereby "discriminat[ing]" "with respect to" a "privilege[]" of employment "because of race . . . [and] sex," ECF No. 1-7 at 3. And CPS's "Culturally Responsive Education and Diversity Policy" directs CPS "to recruit, hire, promote, and retain" a workforce that reflects the student population. ECF No. 1-14 at 5. Because CPS students are 80% Latino and African American, ECF No. 1-4 at 8, the policy necessarily invites race-based preferences.

*Second*, CPS partners with other religious universities that have faith-based employment practices like Moody's. For example, Trinity and Concordia—both religious schools—preferentially employ coreligionists. Trinity considers compliance with its religious mission and principles to be "bona fide occupational qualification[s]" that "impact[] the employment process." VC ¶ 113. And Concordia "reserves the right" to hire coreligionists. *Id.* ¶ 114. Yet CPS has no problem partnering with them—it only balks at doing so with Moody.

All this shows that the employment provisions are neither neutral nor generally applicable. Consider *Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*. There, the Ninth Circuit held en banc that a school's "comprehensive" nondiscrimination policy was not generally applicable because the school's "pattern of selective enforcement" allowed some student groups to select members based on ethnicity and sex even as it prohibited a religious student group from selecting coreligionists for its leadership. 82 F.4th 664, 687–89 (9th Cir. 2023) (en banc). Although "anti-discrimination policies certainly serve worthy causes," they cannot be applied "in a manner that transgresses" the Constitution's "steadfast[]" "commitment" to religious neutrality. *Id.* at 671–72.

Here, the employment provisions—and the exceptions CPS allows for itself and others—might serve "admirable goals." *Id.* at 688. But "it makes equal sense that a religious group be allowed to require its leaders agree with the group's most fundamental beliefs." *Id.* at 689. CPS's "good intentions do not change the fact" that it "treat[s] comparable secular activity more favorably than religious exercise." *Id.* at 688. Because CPS permits the very conduct that it claims it cannot tolerate from Moody, strict scrutiny applies. *Fulton*, 593 U.S. at 533–34.

### 3. CPS cannot satisfy strict scrutiny.

To overcome its exclusion of Moody, CPS bears the burden of satisfying strict scrutiny. But "[a] government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Id.* at 541 (quoting *Lukumi*, 508 U.S. at 546). Thus, if CPS "can achieve its interests in a manner that does not burden religion, it must do so." *Id.* And CPS cannot hide behind a "broadly formulated interest[]" in "equal treatment." *Id.* Instead, it must show a compelling interest, not "in enforcing . . . non-discrimination policies generally," but "in denying an exception" to Moody specifically. *Id.*

CPS can't meet that burden. There is simply no compelling interest in denying Moody an exemption when CPS already allows exemptions for itself and others. CPS also has no legitimate interest—let alone a compelling one—in enforcing the employment provisions against Moody when Moody's employment practices have nothing to do with the student-teaching program. Moody instructs its students to comply with all the host school's rules and requirements. Moody's own coreligionist hiring practices don't hinder CPS. These flaws "undermine [CPS's] contention that its non-discrimination policies can brook no departures." *Id.* at 542.

Nor are the employment provisions narrowly tailored. The fact that CPS allows exemptions for itself and others shows that there are less restrictive alternatives. And federal, Illinois, and Chicago law all explicitly recognize and protect Moody's right to hire coreligionists, confirming that CPS can pursue any legitimate anti-discrimination interest while still respecting Moody's religious freedom. *See* 42 U.S.C. § 2000e-1(a) (religious organizations can prefer "individuals of a particular religion" to "carry[] on" their "activities"); 775 Ill. Comp. Stat. § 5/2-101(B)(2) (similar); Chi. Mun. Code § 6-10-080 ("[N]othing" in Chicago's Human Rights Ordinance "shall apply" to religious organizations' decisions "affecting the definition, promulgating or advancement" of their "mission, practices, or beliefs").

### B. CPS violates the church autonomy doctrine by penalizing Moody's faith-based practice of employing coreligionists.

The First Amendment's Religion Clauses protect religious organizations' right "to decide for themselves, free from state interference, matters of [internal] government." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Known as the church autonomy doctrine, it guarantees religious organizations the freedom to decide questions of faith, doctrine, and religious government for themselves. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). CPS's demand that Moody forfeit its

14

faith-based employment practices violates the church autonomy doctrine in two ways: (1) by interfering with Moody's right to choose ministerial employees, and (2) by penalizing Moody for preferring coreligionists for non-ministerial positions.

***Ministerial Exception.*** One "component" of the church autonomy doctrine is the absolute freedom to "select, supervise, and . . . remove a minister" without government interference. *Our Lady*, 591 U.S. at 746–47. The First Amendment forbids "any attempt by government to dictate or even to influence such matters" because a "wayward" minister "could contradict the [religious organizations'] tenets and lead [its members] away from the faith." *Id.*

Many Moody employees qualify as ministers because they "convey[] [Moody's] message and carry[] out its mission." *Id.* at 750 (quoting *Hosanna-Tabor*, 565 U.S. at 192). Take Moody's faculty. Moody expects them to integrate faith into all aspects of their teaching and charges them with mentoring students in their faith. Smith Decl. ¶ 11. Moody faculty also prepare *Today in the Word*, a daily devotional. VC ¶ 25. "Leading others toward Christian maturity," "teaching faithfully the Word of God," and "transmitting the faith" are vital religious duties—and what Moody's faculty do daily. *Hosanna-Tabor*, 565 U.S. at 192 (citation modified).

Yet CPS insists on interfering with Moody's ministerial hiring decisions as a condition of participating in the student-teacher program. That's wrong. Like the teachers in *Hosanna-Tabor* and *Our Lady*, Moody's employees are responsible for transmitting the faith "to the next generation." *Our Lady*, 591 U.S. at 754 (quoting *Hosanna-Tabor*, 565 U.S. at 192). CPS cannot use its student-teacher program to pressure Moody into hiring nonbelievers as ministers. "[T]he authority to select and control who will minister to the faithful" is not CPS's. *Hosanna-Tabor*, 565 U.S. at 195. It's Moody's—"alone." *Id.*

***Coreligionist Exception.*** CPS also violates Moody's right to staff non-ministerial positions with coreligionists.

Beyond ministerial selection, church autonomy protects "other internal church matters" like non-ministerial employment decisions "rooted in religious belief." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656–57 (10th Cir. 2002) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). The difference is that while the ministerial exception "applies without regard to the type of claims being brought," *Alicea-Hernandez*, 320 F.3d at 703, coreligionist protections apply to any position when the decision concerns "discipline, ecclesiastical government," or the employee's "conformity" "to the standard of morals required of them," *Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich*, 426 U.S. 696, 714 (1976) (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1871)). In other words, church autonomy broadly protects the "religious exercise" of "hiring those with the same religious beliefs." *Gracehaven*, 2025 WL 1158079, at *3 (citation modified).

For those employee positions that are not ministerial, the church autonomy doctrine guarantees Moody's right to fill them with coreligionists. *Bryce*, 289 F.3d at 656–57, 660. Just "[a]s personnel is policy, employees are environment." *Demkovich*, 3 F.4th at 979. And all Moody employees play an active role in creating a Christian environment by proclaiming the Gospel, discipling and praying for one another, and encouraging coworkers in the Christian faith. Smith Decl. ¶ 18. That environment, in turn, "shapes" and reinforces Moody's "faith and mission . . . just as much as . . . its appointments." *Demkovich*, 3. F4th at 980 (citation modified). But forcing Moody to employ people who reject or are indifferent to those goals endangers Moody's ministry, as "wayward" employees could "contradict [Moody's] tenets and lead" other employees "away from the faith." *Our Lady*, 591 U.S. at 747. This the First Amendment does not allow.

16

### C.  CPS also violates Moody's expressive association rights.

Conditioning access to the student-teacher program upon the forced inclusion of nonbelievers also infringes Moody's First Amendment right "to associate with others in pursuit of . . . educational [and] religious . . . ends." *Dale*, 530 U.S. at 647.

The Free Speech Clause safeguards religious organizations' right to choose with whom they want to associate. Naturally, the right to "associate" encompasses the "freedom not to associate." *Id.* at 647–48. So a religious organization can choose not to associate with people who "may impair the [group's] ability" to express its views. *Id.* Indeed, "*who* speaks on a group's behalf colors *what* is conveyed." *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 863 (8th Cir. 2021) (citation modified). Thus, when an association expresses a collective message, the government cannot force it to admit people who reject that message. *See Dale*, 530 U.S. at 647–48.

An expressive associational right attaches when two things are true: (1) the group engages in "expressive association," and (2) the forcible inclusion of a person "significant[ly]" "affects" the group's "ability to advocate public or private view-points." *Id.* at 648. Moody meets both elements.

*First*, Moody is a religious organization—the "archetype" of an expressive association. *Hosanna-Tabor*, 565 U.S. at 200 (Alito & Kagan, JJ., concurring). It exists to spread the Gospel and equip believers to be mature and prepared Christian messengers—and does so through classroom instruction, publications, and radio broadcasts, making it "hard to argue" that Moody "is not an expressive association." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 862 (7th Cir. 2006).

*Second*, the employment provisions would force Moody to not just associate with people who reject its beliefs but to hire them as its speakers and representatives. But Moody can faithfully express its religious message only through employees who affirm and believe it. *See Dale*, 530 U.S. at 653 (courts must defer "to an

17

association's view of what would impair its expression"). By interfering with Moody's expressive association, CPS's actions trigger strict scrutiny, which it fails.

### D. CPS violates Illinois's Religious Freedom Restoration Act by imposing an unjustified substantial burden on Moody.

The Illinois Religious Freedom Restoration Act (IRFRA) mandates that government actions which substantially burden the free exercise of religion must satisfy strict scrutiny, even if the burden results from a generally applicable rule. 775 Ill. Stat. Comp. § 35/10(b)(1); 775 Ill. Stat. Comp. § 35/15. IRFRA defines religious exercise as any "act or refusal to act that is substantially motivated by religious belief, whether or not the religious exercise is compulsory or central to a larger system of religious belief." 775 Ill. Stat. Comp. § 35/5. A substantial burden's "hallmark" is "the presentation of a coercive choice of either abandoning one's religious convictions or complying with [a] governmental regulation." *Diggs v. Snyder*, 775 N.E.2d 40, 45 (Ill. App. Ct. 2002) (citing *Yoder*, 406 U.S. at 217–18). A substantial burden also exists when the government "conditions receipt of an important benefit upon conduct proscribed by a religious faith." *Baumgartner v. City of Chicago*, 759 F. Supp. 3d 868, 880 (N.D. Ill. 2024) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981)).

Moody's faith-based employment practices constitute religious exercise. That is undeniable. *See Alicea-Hernandez*, 320 F.3d at 704 ("Determination of whose voice speaks for the church is *per se* a religious matter." (citation modified)).

CPS substantially burdens Moody's religious exercise by putting the ministry to a coercive choice: give up its faith-based hiring practices or lose out on joining the student-teacher program. Such a condition bears the "hallmark" of a substantial burden because it pressures Moody to "abandon [its] religious conviction[]" that only coreligionists can effectively advance its religious mission and message. *See Diggs*, 775 N.E.2d at 45. Because CPS conditions receipt of a public benefit—the student-

18

teacher program—on Moody abandoning its religious exercise, it must justify that decision by satisfying strict scrutiny. As explained before, it can't.

## II.    Moody satisfies the other preliminary injunction factors.

While the likelihood of success is often decisive in First Amendment cases, *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012), the remaining preliminary injunction factors—irreparable injury, balance of equities, and the public interest—all favor Moody.

***Irreparable Injury.*** "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Indeed, "[u]nder Seventh Circuit law, irreparable harm is presumed in First Amendment cases." *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 450–51 (7th Cir. 2022) (citing *Walker*, 453 F.3d at 859).

Moody faces irreparable injury and will continue to suffer harm without a preliminary injunction. Moody and its students are qualified and eligible to join the program now and in the future. The only reason CPS excludes them is because of Moody's religious exercise. That's irreparable injury.

Moody and its students face other harms beyond the constitutional violations. The clock is ticking for Moody students to line up 10 hours of public-school classroom observation by the end of their sophomore year, and CPS will soon start accepting applications for Fall 2026 student-teacher placements. Smith Decl. ¶¶ 48, 51; *see also* ECF No. 1-5 at 4 (last year's application window for the fall term was April 14 to May 9). Moody's exclusion from the program has prevented its students from obtaining CPS-specialized background checks needed to conduct observations in CPS schools. *Id.* ¶ 51. Without an injunction, students wishing to fulfill their

classroom-observation and student-teaching requirements at CPS will need to scramble for alternative placements and will forever miss out on a valuable opportunity that should have been available to them. Smith Decl. ¶¶ 46–51. And given Moody's downtown location, finding alternative public-school placements will be costly and challenging—especially for those students without reliable means of transportation. *Id.* ¶ 47. In addition, denying access to the student-teacher program damages Moody's reputation and decreases its program's competitiveness during peak college application season. *Id.* ¶¶ 52, 56.

Every day CPS discriminates against Moody and its students is another day that their constitutional rights are violated. This daily deprivation of constitutional rights harms Moody and its students, and monetary damages cannot rectify CPS's ongoing and prospective violations. *Walker*, 453 F.3d at 859. Only an injunction will avert more damage to Moody and its students.

***Balance of Equities and Public Interest.*** The balance of equities and the public interest merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both factors favor an injunction because "protecting First Amendment freedoms" is "always in the public interest," *Alvarez*, 679 F.3d at 590 (quoting *Walker*, 453 F.3d at 859), and excluding Moody hurts everyone while helping no one. CPS hurts Moody by denying it a public benefit, violating its constitutional and statutory rights, causing it reputational damage, and denying its students a valuable credential and employment opportunity. But CPS hurts itself too. It faces a chronic teacher shortage, with hundreds of teacher positions left vacant every year. By shutting out Moody, CPS denies its understaffed schools and underserved students a valuable source of qualified teachers.

## CONCLUSION

For all these reasons, the Court should grant the motion and issue the requested preliminary injunction.

20

Dated: November 24, 2025

s/ Jeremiah Galus
David A. Cortman, N.D. Ill. Bar No. 188810
   dcortman@adflegal.org
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774

Ryan Tucker, AZ Bar No. 034382*
   rtucker@adflegal.org
Jeremiah Galus, AZ Bar No. 030469*
   jgalus@adflegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

Jacob Reed, VA Bar No. 97181*
   jreed@adflegal.org
ALLIANCE DEFENDING FREEDOM
Riverside Parkway
Lansdowne, VA 20176
(480) 388-8263

John W. Mauck, IL Bar No. 1797328
   jmauck@mauckbaker.com
Whitman H. Brisky, IL Bar No. 1665634
   wbrisky@mauckbaker.com
MAUCK & BAKER, LLC
1 North LaSalle Street, Ste. 3150
Chicago, IL 60602
(312) 726-1243

*Attorneys for Plaintiffs*
*\*Admitted Pro Hac Vice*

21