**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE MOODY BIBLE INSTITUTE OF CHICAGO, | ) ) | |
| Plaintiff, | ) | Case No. 25 cv 13500 |
| v. | ) ) | Judge Lindsay C. Jenkins |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) ) | Magistrate Judge |
| Defendant. | ) | M. David Weisman |

**DEFENDANT'S OPPOSITION**
**TO PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

December 23, 2025

Elizabeth K. Barton, Acting General Counsel
Thomas A. Doyle, Assistant Deputy General Counsel (tadoyle2@cps.edu)
Clara R. Kent, Assistant General Counsel (crkent@cps.edu)
Board of Education of the City of Chicago, Law Department
One North Dearborn, Suite 900
Chicago, Illinois 60602
(773) 553-1700
*Counsel for Defendant*

# **Table of Contents**

**Page**

Table of Authorities .................................................................................ii

Factual Background ..................................................................................1

Argument .................................................................................................10

    I.    Moody Bible's motion papers rest on broad quotations
from cases that are not on-point ...................................................11

    II.    Moody Bible's motion papers rest on a partial set of facts ...........12

        A.    Moody Bible avoids saying whether any
student teachers are ready to start immediately .................12

        B.    Moody Bible's motion papers never mention
that the parties continually expressed a willingness
to keep negotiating .............................................................12

        C.    Moody Bible's motion papers ignore the obvious
solution in front of everyone ..............................................13

        D.    Moody Bible's motion papers incorrectly imply
that every other contract term has been agreed upon ........13

    III.    Moody Bible cannot show that it will suffer an irreparable
injury unless the Court enters an injunction now ........................14

    IV.    On the facts, Moody Bible does not have a strong likelihood
of success .....................................................................................16

    V.    The balance of the harms weighs against the proposed
injunction ......................................................................................17

    VI.    The public interest weighs against the proposed injunction ...........18

Conclusion ..............................................................................................19

## Table of Authorities

**Pages**

*Bernacchi v. First Chicago Ins. Inc.,*
    52 F.4th 324 (7th Cir. 2022)................................................................18

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023)..............................................................15

*Carson v. Makin,*
    596 U.S. 767 (2022)...........................................................................11

*Cassell v. Snyders,*
    990 F.3d 539 (7th Cir. 2021)..........................................................16, 19

*Cook Cnty. Repub. Party v. Pritzker,*
    487 F. Supp. 3d 705 (N.D. Ill. 2020)....................................................15

*Espinoza v. Montana Dep't of Revenue,*
    591 U.S. 464 (2020)...........................................................................11

*Finch v. Treto,*
    82 F.4th 572 (7th Cir. 2023)................................................................10

*Harlem Algonquin LLC v. Canadian Funding Corp.,*
    742 F. Supp. 2d 957 (N.D. Ill. 2010)....................................................18

*K.C. v. Med. Licensing Bd. of Indiana,*
    121 F.4th 604 (7th Cir. 2024)..........................................................10, 15

*Trinity Lutheran Church of Columbia v. Comer,*
    582 U.S. 449 (2017)...........................................................................11

*TAS Distrib. v. Cummins Engine Co.,*
    491 F.3d 625 (7th Cir. 2007)..........................................................18, 19

25 Ill. Adm. Code § 25.620................................................................2, 4, 12

In asking for a preliminary injunction, Moody Bible's motion papers imply that the Board of Education of the City of Chicago (also known as Chicago Public Schools or CPS) violated Moody Bible's First Amendment rights. But Moody Bible's motion papers bear no connection to what actually happened.

In July of 2025, Moody Bible and CPS were in discussions about Moody Bible becoming a student-teaching partner with CPS. The parties hit a snag, because Moody Bible was concerned about Non-Discrimination Language in CPS's documents. Nonetheless, the parties repeatedly promised to keep talking to try to work it out. Indeed, there were other open contract terms that the parties never even exchanged or discussed. Moody Bible pledged to keep negotiating, but then Moody Bible abruptly went silent and sued CPS. Now, Moody Bible is asking for a pretrial injunction to place Moody Bible students in CPS classrooms even though the parties have not yet agreed on a contract.

As discussed below, the Court can decide this Motion by focusing on the facts, without necessarily tackling the big-picture First Amendment issues that Moody Bible relies upon. With this brief, we are attaching a Solomon Affidavit *(ECF 27-1)* and a Presley Affidavit *(ECF 27-2)*, and we are filing a separate Appendix of documents *(ECF 26)*. We cite to those materials throughout this brief. Based on the factual record, the Court should deny the Motion.

## **Factual Background**

To obtain a teaching license in Illinois, university students need to complete several practical-experience requirements. As part of their degree programs,

education majors usually observe a school classroom *(ECF 27-2 ¶ 3)*. In addition, they must complete student teaching, where they work as supervised teachers in an actual classroom, during their final year of undergraduate work. 25 Ill. Adm. Code § 25.620(a). See also *ECF 23-1 ¶¶ 23-25; ECF 27-2 ¶ 3*.

**CPS's experience with student teaching.** CPS partners with universities who want to send their undergraduate students -- typically education majors -- into CPS classrooms for clinical observation or for student teaching *(ECF 27-1 ¶ 3; ECF 27-2 ¶¶ 4, 7; ECF 26 Appendix 92-93 §§ I-II)*. Undergraduate student teachers need to pass the CPS background check process and complete mandatory trainings before they can be in CPS classrooms *(ECF 27-2 ¶ 5; ECF 26 Appendix 96 § VI; ECF 26 Appendix 28 ¶ 10.4)*. At all times, CPS has a duty to prioritize student safety and to provide a safe and effective classroom environment for students *(ECF 27-2 ¶ 5)*.

CPS has dozens of university-partners for clinical-observation and student-teaching programs *(ECF 27-1 ¶¶ 3, 5(b))*. CPS requires a university-partner to go through two processes:

    (i)    the university partner must become an approved CPS vendor and must click through on the CPS Procurement portal to accept certain documents; and

    (ii)    the university partner must agree to a version of CPS's template contract entitled "Student Teaching Internship Agreement."

*(ECF 27-1 ¶¶ 3-5; ECF 26 Appendix 96 § IX; ECF 27-2 ¶ 6)*.

**CPS's Vendor Terms & Conditions.** At CPS, the standard vendor documents include Vendor Terms & Conditions *(ECF 27-2 ¶ 6)*. Parties can override CPS's Vendor Terms & Conditions by negotiating a specific contract to govern their

2

particular relationship *(ECF 27-1 ¶ 4(a); ECF 26 Appendix 56)*. That is, if the parties sign a contract, their signed contract controls, and not the boilerplate Terms & Conditions *(id.)*.

**CPS's Student Teaching Internship Agreement.** To partner with CPS on student teaching programming, CPS requires its university-partners to sign a Student Teaching Internship Agreement *(ECF 27-1 ¶ 3; ECF 26 Appendix 96 § IX)*. See also *ECF 26 Appendix 20-42* (copy of that template). In that template, CPS includes Nondiscrimination Language *(ECF 27-1 ¶ 5(c); ECF 26 Appendix 21-22 ¶ 3.3)*. CPS requires that provision of all of its university-partners, regardless of whether they are religiously-affiliated. That is, that Non-Discrimination Language is generally required and it is not directed only at religious institutions *(id.)*. In fact, many religiously-affiliated universities have signed agreements containing that Nondiscrimination Language, including DePaul University, Hope College, Lewis University, Loyola University of Chicago, and Trinity Christian College *(ECF 27-1 ¶ 5(d); ECF 1-11)*. Also, many public universities have become CPS partners using that language, including Illinois State University and the University of Illinois-Chicago, as two examples *(ECF 27-1 ¶ 5(b); ECF 1-11)*.

CPS is willing to adapt the language to meet particular concerns. A few religiously-affiliated schools have negotiated variances in the Nondiscrimination Language in the template Student Teaching Internship Agreement. For example, Dominican University has negotiated a different version of the same clause, so that their agreement reads *(ECF 27-1 ¶ 5(d)(ii)):*

3

> "**Nondiscrimination.** The parties agree to comply with all federal and state nondiscrimination, equal opportunity and affirmative action laws, orders and regulations. The parties shall not engage in discrimination or harassment against any person because of race, color, religion, sex, national origin, ancestry, age, marital status, handicap, unfavorable discharge from the military, or status as a disabled veteran or a veteran of the Vietnam era."

See also *ECF 26 Appendix 127 ¶ 3.3*. And in their versions of the contracts, Concordia College and Liberty University customized the Non-Discrimination Language *(ECF 27-1 ¶¶ 5(d)(i) and (iii))*. See also *ECF 26 Appendix 103-04 ¶ 3.3* (where Concordia added the phrase "except as allowed by applicable law"); *ECF 26 Appendix 151-52 ¶ 3.3* (where Liberty added the phrase "as defined under applicable law"). And see *ECF 26 Appendix 175-76 ¶ 3.3* (Walden contract, which also amended the template's Nondiscrimination Language).

**Moody Bible's plans at CPS.** As 2024 was beginning, the Illinois State Board of Education had approved Moody Bible's application for a new certification program for elementary education majors *(ECF 1-3; ECF 23-1 ¶ 29)*. Moody Bible's program was scheduled to begin in the 2025-2026 school year *(ECF 1 ¶ 77; ECF 23-1 ¶¶ 21, 30)*. Moody contemplated that its students would learn on Moody Bible's campus in Year One (their Freshman year), but that starting in Year Two (their Sophomore year), Moody Bible students would begin classroom observation assignments in public elementary school classrooms *(ECF 23-1 ¶ 23; ECF 26 Appendix 100)*. Moody Bible also contemplated that its students would begin student teaching in a public elementary school in Year Four (their Senior year) *(ECF 27-2 ¶ 3; ECF 26 Appendix 100; ECF 1 ¶¶ 68-70; ECF 23-1 ¶ 25)*. See also 25 Ill. Adm. Code § 25.620(a) (requiring student teaching in the final year of a degree

program).

Moody Bible began Year One of its program in the Fall of 2025 *(ECF 1 ¶ 77; ECF 23-1 ¶¶ 21, 30; ECF 26 Appendix 5)*. Moody Bible is roughly one year away from having students ready to place at CPS for observations *(ECF 26 Appendix 11)*. Moody Bible is roughly three years away from having students ready to place at CPS for student teaching roles. *ECF 26 Appendix 100* (showing the timeline for the Freshman who launched Moody Bible's program in the Fall of 2025, which included that they would student teach in 2029, in their Senior Year).

**Moody Bible's progress through CPS's approval process.** Moody Bible sought approval to become a university-partner with CPS on student teaching. In late 2024, Moody Bible coordinated with CPS's Information Technology department regarding data security clearances *(ECF 27-2 ¶ 8; ECF 26 Appendix 2)*. In early 2025, Moody Bible worked with CPS's Risk Managers to make sure that Moody Bible had all of the required insurance to be a CPS vendor *(ECF 27-2 ¶ 9; ECF 26 Appendix 5-8)*. Moody Bible also identified a university contact person, who completed the CPS background check process *(id.)*.

By June of 2025, CPS's Procurement team advised Moody Bible that CPS had approved Moody Bible as a vendor, but Moody Bible still needed to visit CPS's Procurement portal to click on some documents, including CPS's boilerplate Vendor Terms & Conditions *(ECF 27-2 ¶ 10; ECF 26 Appendix 9, 51)*. On June 11th, CPS's Procurement team sent Moody Bible the required vendor paperwork *(id.)*, with a tentative deadline of July 17th to complete that paperwork stage.

On June 25th, Moody Bible's legal team asked for a meeting to raise some legal issues about the vendor documents *(ECF 27-2 ¶ 11-12; ECF 26 Appendix 10-13)*.

**The July 9th meeting.** On Wednesday, July 9th, the Moody Bible legal team met with the CPS legal team in a video-conference meeting. That meeting included Grace Solomon (a CPS Assistant General Counsel) and Mandisa Inniss (a CPS paralegal) and Lisle Stalter from Moody Bible *(ECF 27-1 ¶ 7)*. In that meeting, Moody Bible raised concerns about the Nondiscrimination Language in the Vendor Terms & Conditions *(id.; ECF 26 Appendix 16)*.

Immediately following that July 9th meeting, Ms. Solomon advised that CPS has a Comprehensive Non-Discrimination Policy *(ECF 27-1 ¶ 8; ECF 26 Appendix 19)*. Ms. Solomon advised that CPS had limited flexibility on the Vendor Terms & Conditions language about non-discrimination *(id.)*. As Ms. Solomon put it, CPS cannot "accommodate language that permits discrimination" *(ECF 26 Appendix 19)*, but she offered to discuss the issue further *(id.)*. Ms. Solomon also offered to discuss how other religious institutions had dealt with CPS's Nondiscrimination Language *(id.)*. Ms. Solomon also sent Moody Bible a copy of the CPS's template for its Student Teaching Internship Agreement *(ECF 27-1 ¶ 8; ECF 26 Appendix 20-42)*, which included Nondiscrimination Language (similar to the clause that Moody Bible had flagged in the vendor document). Ms. Solomon invited further collaboration and discussion *(ECF 26 Appendix 19)*. And that same day, Kathleen Thompson of CPS's Talent Office asked if Moody Bible had any proposed changes to

the template for the Student Teaching Internship Agreement *(ECF 26 Appendix 17)*. In response, Ms. Stalter thanked the CPS team and said that Moody Bible was happy to continue the conversation about the contract language *(ECF 27-1 ¶ 9; ECF 26 Appendix 45)*.

**Following that July 9th meeting.** Ms. Solomon then asked Moody Bible to propose sample language for the Student Teaching Internship Agreement template, so that the parties might consider the issue further *(ECF 27-1 ¶ 10; ECF 26 Appendix 44-45)*. A few days later, on July 14th, Ms. Stalter sent Moody Bible's proposal *(ECF 27-1 ¶ 11; ECF 26 Appendix 44)*. Ms. Stalter proposed a stand-alone amendment -- captioned "Amendment to the Student Teaching Internship Agreement and the Vendor Terms and Conditions" -- which would add the following language *(ECF 27-1 ¶ 11; ECF 26 Appendix 44, 48-49)*:

> "[Moody Bible] qualifies and executes the Agreement and the Terms and Conditions with the understanding of the parties that it acts in a manner permitted by applicable law, including any exemptions and protections afforded by virtue of [Moody Bible's] status as a faith-based religious institution, and such actions shall not subject it to sanctions from [CPS]."

Ms. Stalter invited further discussion on the issue *(ECF 27-1 ¶ 11; ECF 26 Appendix 44)*. And Ms. Stalter mentioned that Moody Bible would be raising some other concerns about other provisions -- not relating to the non-discrimination provisions -- in CPS's Student Teaching Internship Agreement *(id.)*.

On July 15th, Ms. Solomon responded to Ms. Stalter's draft, saying that CPS could not change its Vendor Terms & Conditions but that CPS may be able to fold changes into the Student Teaching Internship Agreement itself (instead of

negotiating an Amended Agreement before any initial contract existed) *(ECF 27-1 ¶ 12; ECF 26 Appendix 51)*. Ms. Solomon then sent Ms. Stalter a Word version of the Student Teaching Internship Agreement template for Moody Bible's review and edits *(ECF 27-1 ¶ 13; ECF 26 Appendix 66)*. Ms. Solomon said that a more "formal negotiation" would follow if the Student Teaching Internship Agreement's Nondiscrimination Language could be modified in a mutually-agreeable way, and she invited Ms. Statler to "Feel free to share any edits or comments" *(ECF 26 Appendix 66)*.

Ms. Stalter then raised a practical concern: she asked if CPS's Procurement team had a July 17th deadline for the Moody Bible file *(ECF 27-1 ¶¶ 14-15)*. Ms. Stalter proposed that the parties defer negotiating the Student Teaching Internship Agreement until the Procurement process was complete *(ECF 26 Appendix 72)*. On July 16th, Ms. Solomon responded that CPS could not agree to Moody Bible's requested language modification to the Terms & Conditions *(ECF 27-1 ¶ 16; ECF 26 Appendix 71-72)*. Ms. Solomon advised that maybe if Moody Bible was entirely unable to find a way to live with CPS's comprehensive non-discrimination policy, then maybe a contract was not going to be possible *(id.)*. Ms. Stalter responded that she was continuing to discuss the matter internally at Moody Bible, and she promised to advise if Moody Bible had further questions *(ECF 26 Appendix 71)*.

**The parties promise to continue their discussions.** Moody Bible formally asked CPS's Procurement team to extend their July 17th deadline for the documents so that the parties could continue to negotiate *(ECF 27-2 ¶ 13; ECF 26*

*Appendix 78).* "It seems we can get this done," Moody Bible said *(ECF 26 Appendix 77).* Moody Bible advised that they needed more time to review the Procurement documents and CPS's non-discrimination policy, offering again to reach out with more questions as the process went along *(ECF 27-1 ¶ 17; ECF 26 Appendix 80).* CPS's Procurement team extended the discussion deadline, as Moody Bible requested *(ECF 27-2 ¶ 13; ECF 26 Appendix 86).* On July 22, 2025, Moody Bible advised that the two sides "will be continuing discussions on the non-discrimination policy" *(ECF 26 Appendix 91).* See also *ECF 27-2 ¶ 14.*

**Moody asks to start without a contract.** In a twist, Moody Bible asked (for the first time) if Moody Bible could start the process for placing their students in CPS classrooms immediately (even while contract discussions continued) *(ECF 27-2 ¶ 14; ECF 26 Appendix 91).* On July 24th, CPS answered that CPS could not "green-light Moody Bible students into CPS classrooms" until after the two institutions had figured out the contract *(ECF 27-2 ¶ 14; ECF 26 Appendix 90).* On July 25th, Moody Bible responded, "Duly noted. Thank you for your assistance" *(ECF 26 Appendix 90).* And then the Moody Bible team stopped communicating *(ECF 27-1 ¶ 20; ECF 27-2 ¶ 16).*

This entire process -- from when Moody Bible first raised issues in that initial conference call until Moody Bible went silent -- spanned just seventeen days, from July 9th to July 25th. And during that seventeen-day stretch, Moody Bible promised to propose additional markups to the Student Teaching Internship Agreement template, but Moody Bible never sent those additional proposals. Based on Moody

Bible's last messages, CPS understood that the parties were still in discussions about the contract language *(ECF 27-1 ¶¶ 19-22)*. CPS was -- and is -- willing to agree to contract language to address Moody Bible's concerns *(id. ¶ 21)*.

## **Argument**

Moody Bible's motion papers ask for an injunction:

- Prohibiting CPS from enforcing its "Employment Provisions against Moody's faith-based practice of employing only coreligionists" *(ECF 23 ¶ 6(a))*;

- Prohibiting CPS from "excluding Moody and its students" from CPS's "student-teaching programs and clinical experiences" because of Moody Bible's faith-based employment practices *(ECF 23 ¶ 6(b))*; and

- Prohibiting CPS from "terminating, rescinding or refusing to enter into any agreements with Moody related to student-teaching program including field and clinical experiences because of Moody's faith-based employment practices" *(ECF 23 ¶ 6(c))*.

But Moody Bible's motion papers ignore the rule that a preliminary injunction is a far-reaching exercise of judicial power -- and a request is "never to be indulged" -- except when the case clearly demands it. *Finch v. Treto,* 82 F.4th 572, 578 (7th Cir. 2023). To obtain a preliminary injunction, a movant must establish: (i) that he is likely to suffer an irreparable injury before trial unless the court issues a pretrial injunction; (ii) that he is likely to prevail on the merits of his claims; (iii) that the balance of equities tips in favor of issuing a pretrial injunction; and (iv) that a pretrial injunction would serve the public interest. See *K.C. v. Med. Licensing Bd. of Indiana,* 121 F.4th 604, 613 (7th Cir. 2024) (listing the four requirements for a preliminary injunction). As discussed below, Moody Bible's motion papers do not meet any of these requirements.

## I.     Moody Bible's motion papers rest on broad quotations from cases that are not on-point.

Moody Bible's motion papers begin by discussing abstract principles of First Amendment law from recent Supreme Court cases. See *ECF 24, pp.9-11* (discussing Supreme Court cases from recent years). But Moody Bible's motion papers rely heavily on cases involving government entities who refused to deal with any religiously-affiliated applicants. For example, in *Trinity Lutheran Church of Columbia v. Comer,* 582 U.S. 449, 453 (2017), the government program was unlawful because it "categorically disqualified" all applicants that were affiliated with a church. See also *Espinoza v. Montana Dep't of Revenue,* 591 U.S. 464 (2020) (government program was unlawful because it barred government aid to all religiously-affiliated schools), and *Carson v. Makin,* 596 U.S. 767 (2022) (tuition reimbursement program was unlawful because it excluded all students attending religious schools). None of those cases are similar to the CPS student teaching program, because CPS does not have a blanket rule against contracting with religiously-affiliated universities. See *ECF 27-1 ¶ 4* (discussing how CPS contracts with religiously-affiliated schools). Indeed, CPS is willing to negotiate a contract with Moody Bible to accommodate Moody Bible's specific First Amendment concerns *(ECF 27-1 ¶ 21)*.

In its motion papers, Moody Bible does not identify a single precedent that requires a preliminary injunction to force a local-government-entity to contract with a vendor when: (i) the parties were still in negotiations toward a contract; (ii) the government entity is willing to accommodate the vendor's concerns about the First

Amendment; and (iii) the parties had not yet reached agreement on other material terms for a contract. See *ECF 27-1 ¶¶ 4, 19-22*.

In short, Moody Bible's motion papers rest on cases that are not helpful here.

## II.  Moody Bible's motion papers rest on a partial set of facts.

Moody Bible's motion papers elide some important facts.

### A.  Moody Bible avoids saying whether any student teachers are ready to start immediately.

Instead of identifying how many students are being shut out of student teaching (or observation) opportunities right now, Moody Bible's motion papers vaguely allude to the current situation for its students. The reality is that Moody Bible just began a new state-approved four-year degree program for elementary education (the program at issue here). Moody Bible's program just started its first Freshman class in the Fall of 2025 *(ECF 1 ¶ 77; ECF 23-1 ¶¶ 21, 30; ECF 26 Appendix 100).* The current Freshmen are not scheduled for classroom observations until the Spring of 2027 (when they are Sophomores) *(ECF 26 Appendix 100).* The current Freshmen are not scheduled to begin student teaching until their Senior years (in the Spring of 2029) *(id.; ECF 1 ¶¶ 68-70; ECF 23-1 ¶ 25).* See also 25 Ill. Adm. Code § 25.620(a) (student teaching must happen in the last year of the undergraduate program). In short, Moody Bible's motion papers never identify a single student teacher whose timeline demands an immediate pretrial injunction.

### B.  Moody Bible's motion papers never mention that the parties continually expressed a willingness to keep negotiating.

Moody Bible's motion papers imply that CPS took an extreme position and

there was no hope of a negotiated solution. But the record shows that Moody Bible made only a brief effort at negotiating, over the course of a few weeks in July. And even then, everyone expressed a willingness to keep negotiating. See *ECF 27-1 ¶¶ 7-14, 18-22; ECF 27-2 ¶¶ 13-14; ECF 26 Appendix 19, 44-45, 51, 77-78, 80, 91.* Instead of acknowledging the record -- which shows the parties' willingness to collaborate -- Moody Bible's motion papers incorrectly suggest that an injunction is Moody Bible's only hope.

### C. Moody Bible's motion papers ignore the obvious solution in front of everyone.

Moody Bible's motion papers ignore the fact that CPS has been willing to do business with religiously-affiliated universities. Their motion papers also ignore the fact that CPS has agreed to modifications in the Nondiscrimination Language (in the Student Teaching Internship Agreement) with other religious schools *(ECF 27-1 ¶ 5(d))*. CPS is willing to agree to negotiate a solution with Moody Bible *(ECF 27-1 ¶ 21)*. Moody Bible's motion papers ignore this easy solution.

### D. Moody Bible's motion papers incorrectly imply that every other contract term has been agreed upon.

Moody Bible's motion papers imply that, but for the Nondiscrimination Language issue, Moody Bible would be in a contract with CPS. But that is incorrect. Moody Bible has said that it intends to raise other issues -- never identified -- regarding the Student Teaching Internship Agreement template *(ECF 27-1 ¶¶ 11, 22)*. CPS does not know what Moody Bible's objections will be. In other words, the Nondiscrimination Language is not the last hurdle to clear here, because CPS needs

13

an actual contract *(ECF 27-2 ¶ 14; ECF 26 Appendix 90)*. See also *ECF 26 Appendix, 96 § IX* (student teachers cannot begin until the university negotiates and signs a contract with CPS). Accordingly, even if the requested preliminary injunction issued, Moody Bible could not begin student teaching placements.

Moody Bible's motion papers ignore all of these facts, instead hoping for a court-imposed solution. Once the facts are properly accounted for, Moody Bible's request for an injunction is not a sensible solution to this situation.

## III. Moody Bible cannot show that it will suffer an irreparable injury <u>unless the Court enters an injunction now.</u>

Moody Bible's motion papers offer a cursory discussion of irreparable injury *(ECF 24, pp.19-20)*, claiming that an injunction is required because the facts suggest an irreparable injury. But that is incorrect, for several reasons.

**<u>Moody Bible has a simpler way to avoid injury.</u>** Short of a preliminary injunction, Moody Bible has a simpler way to avoid suffering any harm. Moody Bible can negotiate a contract modification, following the examples from the Concordia contract, the Dominican contract, or the Liberty contract, as discussed above. Any of those modifications would safeguard Moody Bible's First Amendment rights. There may be other possible solutions that would be mutually-agreeable. But in any event, any harm here is not irreparable, given that Moody Bible has an easy way to solve this. And given everyone's expressed willingness to keep negotiating, the record here does not show any "chilling" of Moody Bible's rights.

**<u>No details regarding specific student teachers.</u>** As discussed above *(Part II.A)*, Moody Bible students are at least a year away from their observation

experiences and they are three years away from student teaching. In other words, the supposed student-needs are not time-sensitive. The record here does not show that a pretrial injunction is a must.

**The lack of a contract means that any harm here is speculative.**

Moody Bible seems to be arguing that it is suffering harm every day unless an injunction issues before trial. That is, Moody Bible is supposing that it will have a contract as soon as the Nondiscrimination Language is resolved. The record does not support that supposition, given that the parties have not reached agreement on the other material terms for a contract. Moody Bible's supposition is really just speculation. A speculative theory is not enough to show an irreparable injury. *Bevis v. City of Naperville,* 85 F.4th 1175, 1188 (7th Cir. 2023) ("mere possibility" of a Constitutional injury is not enough).

**Moody Bible is misreading the law regarding presumption.** Moody Bible's motion papers argue that irreparable injury is always presumed in any First Amendment lawsuit *(ECF 24, p. 19)*, but that is a distortion of the legal principle. When a First Amendment claim does not make sense on the facts, a trial court should not presume an irreparable injury simply because the plaintiff pled a First Amendment claim. *K.C.,* 121 F.4th at 632. See also *Cook Cnty. Repub. Party v. Pritzker,* 487 F. Supp. 3d 705, 714-15 (N.D. Ill. 2020) (if the facts suggest the Constitutional injury is unlikely to occur, plaintiff has not shown an irreparable injury). Here, there is certainly no reason to presume an irreparable injury, given that Moody Bible's claim is so unsupported by the facts regarding the negotiations.

Because Moody Bible has failed to show an irreparable injury, the Court should deny this Motion. See *Cassell v. Snyders,* 990 F.3d 539, 543 (7ᵗʰ Cir. 2021) (when the risk of irreparable injury is low in a First Amendment case, "equitable considerations weigh against granting a preliminary injunction").

## IV. On the facts, Moody Bible does not have a strong likelihood of <u>success.</u>

In arguing about likelihood of success on its First Amendment claim, Moody Bible's motion papers assert that CPS is excluding Moody Bible and its students from student teaching opportunities based on Moody Bible's religious character and status as a religious entity. See *ECF 24 pp.9-11*. But that is incorrect as a matter of fact. CPS is willing to negotiate a contract with Moody Bible. See *Part II.B,* above. CPS has contracted with many religious entities (*ECF 27-1 ¶ 5*). And CPS is willing to give Moody Bible modified language in the Student Teaching Internship Agreement (see *Part II.C,* above; *ECF 27-1 ¶ 21)*. On these facts, Moody Bible is unlikely to be able to show that CPS is excluding Moody Bible because of its religious character or its exercise of faith.

Moody Bible next argues that the Nondiscrimination Language is not neutral or generally applicable *(ECF 24, pp.11-14)*, but that also incorrect on the facts. CPS includes that language in its Student Teaching Internship Agreements with all universities, public and private. The language does not mention different treatment for religious schools. And, on some occasions, CPS has modified the language to accommodate religious schools. Indeed, Moody Bible mentions Concordia *(ECF 24, p.12)* without mentioning that CPS has accommodated

Concordia on the Nondiscrimination Language. See *ECF 27-1 ¶ 5(d)(i).*

In a *non sequitur,* Moody Bible's motion papers argue about CPS's own hiring practices that involve race and gender considerations *(ECF 24, p.12)*, without explaining how that matters. CPS's own hiring practices have nothing to do with whether CPS generally requires Nondiscrimination Language in its student teaching agreements.

Moody Bible's motion papers then accuse CPS of violating the church autonomy doctrine, the expressive association doctrine, and an Illinois statute *(ECF 24, pp.14-19)*. But none of those arguments take into account the facts: CPS is willing to contract with Moody Bible in a way that lets Moody Bible stand on its rights under the law. For example, if Moody Bible accepted the phrasing from either the Concordia contract or the Liberty Contract *(ECF 27-1 ¶¶ 5(d)(i) and (iii))*, Moody Bible would not miss out on the legal exceptions that are extended to churches and religious entities.

On the actual facts, Moody Bible has little chance of succeeding.

## V.   <u>The balance of the harms weighs against the proposed injunction.</u>

Moody Bible's motion papers gloss over the fact that the parties never hit a standstill in their contract discussions, as discussed above. Talks were still ongoing, or at least still possible. Moody Bible's motion papers are really a request to short-circuit any negotiations, forcing CPS to accept Moody Bible's entire position about the issue. This imposes a cost on CPS, because it would curtail CPS's ability to negotiate its own student teacher relationships. In this district, courts are reluctant

to impose a court-ordered solution when the parties have not even reached a contract. See, *e.g., Harlem Algonquin LLC v. Canadian Funding Corp.,* 742 F. Supp. 2d 957, 960-61 (N.D. Ill. 2010) (mandatory injunction for specific performance is unavailable if the parties have not reached a binding contract, because an injunction would force terms on one side or the other). This concern is especially pointed here, given that the parties never finished negotiating the terms of a contract. See *Bernacchi v. First Chicago Ins. Inc.,* 52 F.4th 324, 329 (7th Cir. Cir. 2022) (a court will not enter an injunction to enforce a contract when the terms are too uncertain or ambiguous to be enforceable). See also *TAS Distrib. v. Cummins Engine Co.,* 491 F.3d 625, 637 (7th Cir. 2007) (a specific performance injunction should not issue when the contract terms are too indefinite).

This is not an abstract concern. CPS uses a thorough contracting process because CPS is trying to keep its students safe. See *ECF 27-2 ¶ 5.* An injunction would erode CPS's contracting process, which is a valuable student-protection tool. Weighed against the vaguely-articulated irreparable harm, the balance of equites disfavors an injunction here.

## VI.   The public interest weighs against the proposed injunction.

In two ways, the proposed injunction is against the public interest.

First, as discussed above, the injunction erodes CPS's ability to move cautiously before allowing student teaching placements. See *ECF 26 Appendix 96 § IX* (Board policy requires a contract before student teachers can begin). This is, of course, a student safety concern. See *ECF 27-2 ¶ 5.* The Court should carefully

consider whether the proposed injunction promotes -- or limits -- CPS's ability to safeguard its students. (It is not hard to imagine a situation where a student teacher could be harmful. CPS avoids that risk by proceeding cautiously with contracting and by supervising the student teachers in its programs.) Because the proposed injunction would not serve the best interests of CPS students, the Court can deny it. See, *e.g., Cassell,* 990 F.3d at 550-51 (considering impact on "those before the court").

Second, the proposed injunction imposes a judicial cost, because Moody Bible is asking the Court to take on an ongoing supervisory role. See *ECF 23 ¶ 6(b)* (asking the Court to police why CPS might exclude any Moody Bible student teaching candidate). Trial courts are understandably wary about issuing such a supervisory order. See *TAS Distrib.,* 491 F.3d at 637 (declining to enter an order that would "mandate ongoing supervision by the court").

The public interest does not favor the injunction requested here.

## <u>Conclusion</u>

For the foregoing reasons, the Court should deny Moody Bible's request for a preliminary injunction.

As an alternative, the Court should stay this litigation for thirty days so that the parties can negotiate. If the parties can agree on contract language, this entire litigation can be avoided.

December 23, 2025   Respectfully submitted,

         Elizabeth K. Barton, Acting General Counsel

         By:  */s/ Thomas A. Doyle*

Thomas A. Doyle, Assistant Deputy General Counsel (tadoyle2@cps.edu)
Clara R. Kent, Assistant General Counsel (crkent@cps.edu)
Board of Education of the City of Chicago, Law Department
One North Dearborn, Suite 900
Chicago, Illinois 60602
(773) 553-1700
***Counsel for Defendant***

## **CERTIFICATE OF SERVICE**

I certify that on December 23, 2025, I caused the foregoing document be served on Plaintiff's Counsel via the Court's ECF system.


By: _/s/ Thomas A. Doyle_